## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ANTHONY BELISLE,<br><br>        Plaintiff,<br><br>v.<br><br>MARKEL CATCO INVESTMENT MANAGEMENT LTD AND MARKEL CORP.,<br><br>        Defendants. | CIVIL ACTION NO. |

## COMPLAINT AND JURY DEMAND

Plaintiff, Anthony Belisle, brings this Complaint against Markel CATCo Investment Management Ltd ("Markel CATCo") and Markel Corp. ("Markel" or, collectively with Markel CATCo, "Defendants").

## OVERVIEW

1.      This action arises from the improper and unlawful actions of Markel, as well as its wholly owned subsidiary Markel CATCo and others acting at Markel's behest, through which Defendants have refused to make vested incentive payments due to Mr. Belisle in the amount of $65,950,000, and tarnished Plaintiff's reputation to prevent him from competing with Markel or Markel CATCo in the future.  The Defendants have employed unlawful, unfair and deceptive means to achieve these ends.  Among other things, they wrongfully terminated Mr. Belisle's employment based on a pretextual, purported violation of company policy that was not in fact a violation of the policy at the relevant time; they amended the same policy just days before the

termination but after the incentive payments had vested, in an apparent attempt to create a justification for their action; they took these actions to the decided detriment of the investors in the funds managed by Markel CATCo; they trumpeted a pretextual reason for the termination publicly to divert attention from the real, and wrongful reasons; they implied in the public announcement that the termination somehow related to a Government inquiry regarding loss reserves, when it did not, in an attempt to ensure that Mr. Belisle's reputation would be damaged so that he could not compete with Markel in the future; and, in conducting all such activities, they maliciously, intentionally, with reckless disregard for the truth, and/or negligently caused irreparable and foreseeable harm to Plaintiff and his good reputation.

2.     Mr. Belisle has over 33 years of pension, insurance, and capital markets experience.  He has been a Fellow of the Society of Actuaries since 1994.  On September 9, 2015, QIC, the Qatari entity that then owned CATCo, sold the Bermuda reinsurance investment company created and developed by Plaintiff to Markel.  In conjunction with, and integral to, the sale, and in reasonable reliance on assurances by Markel, Plaintiff entered into an employment agreement with Markel CATCo, attached hereto as Ex. 1 (the "Employment Agreement"). Pursuant to the Employment Agreement, Plaintiff was to remain with CATCo for a period of at least three years and receive an incentive compensation structure comprised of, among other elements, a Continued Service Element ("CSE") and a Performance Element ("PE") (collectively, the "Incentive Payments").  The CSE and PE were scheduled to vest fully on December 31, 2018.  If Plaintiff remained employed in good standing on December 31, 2018, the last payments, totaling $65,950,000, were to be made by Markel CATCo on or before January 30, 2019.

3.      Notwithstanding that commitment, as the deadline approached for Markel CATCo to pay the significant final Incentive Payments, after attempting but failing to persuade Plaintiff to forego, materially reduce, or materially delay the last payments, Markel used its ownership and control of its wholly owned subsidiary Markel CATCo to contrive a scheme to avoid payment of the $65,950,000 Incentive Payments that it owed.

4.      On January 18, 2019, after Plaintiff rejected repeated entreaties by Markel to reduce or forfeit his promised Incentive Payments, Markel reconstituted the Markel CATCo Board with its own captive directors in order to cause Markel CATCo to terminate the employment and directorships of both Plaintiff and Markel CATCo's Chief Executive Officer-Bermuda, Alissa Fredricks.  Defendants claimed that the terminations were "for cause," and were based upon an undisclosed personal relationship between Plaintiff and Ms. Fredricks.  Even though Plaintiff's Incentive Payments had already vested at that time, and were clearly due and owing under the terms of the Employment Agreement, Markel refused to satisfy, or to allow Markel CATCo to satisfy, the payment obligations.

5.      In conjunction with the termination of Plaintiff's employment, in a manner that ensured that Plaintiff would be critically impaired in any efforts to compete with Markel or Markel CATCo in the future, Markel publicly announced the termination and the false, pretextual grounds upon which it purportedly was based, and at the same time falsely intimated that Mr. Belisle's termination was also related to an ongoing government inquiry.

6.      Plaintiff now brings this action to enforce his rights, including his right to the final Incentive Payments, under his Employment Agreement and under the law, and to recover for additional damages suffered as a result of Defendants' unlawful conduct.

## PARTIES

7.      Plaintiff is an individual with a principal residence in Florida, who previously resided in New Hampshire, for which reason his Employment Agreement includes a New Hampshire forum selection clause.

8.      Defendant Markel CATCo Investment Management Ltd. is a Bermuda exempted company with limited liability.  Markel CATCo's principal place of business is in Hamilton, Bermuda, and it conducts business all over the world.  Markel CATCo is a party to the Employment Agreement containing the New Hampshire forum selection clause.

9.      Defendant Markel Corporation is a corporation organized under the laws of the Commonwealth of Virginia.  Markel's principal executive offices are located in Glen Allen, Virginia, and it likewise conducts business all over the world, including in New Hampshire. Markel is an express third party beneficiary under the Employment Agreement between Plaintiff and Markel CATCo.  In addition, by virtue of its conduct from the time that Markel CATCo was formed, including without limitation Markel's actions in taking over control of the Markel CATCo Board of Directors on or about January 17 or 18, 2019 in order to terminate Plaintiff's employment, Markel was an alter ego to, its wholly owned subsidiary Markel CATCo.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Markel and Markel CATCo are citizens of a different state and a foreign state, respectively, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This Court also has personal jurisdiction over Defendant Markel CATCo because, among other things, Markel CATCo consented and agreed to the exclusive jurisdiction and venue of the state and federal courts of New Hampshire to resolve any claims arising under or

relating to the Employment Agreement pursuant to Section 16.1 of the Employment Agreement. *See* N.H. Rev. Stat. Ann. § 508-A:2.

12.    This Court has personal jurisdiction over Defendant Markel because:

a.    Defendant Markel transacted business and contracted with Mr. Belisle in New Hampshire on matters directly related to the current dispute, including the negotiation of the purchase of CATCo and the negotiation and execution of the Employment Agreement.

b.    Defendant Markel has availed itself of the laws of New Hampshire as a third-party beneficiary to the Employment Agreement between Mr. Belisle and Markel CATCo, Markel's wholly owned subsidiary, which Markel CATCo signed while under Markel's control.   *See* Employment Agreement § 14.1.   Pursuant to Section 16.1 of the Employment Agreement, Markel's rights as a third-party beneficiary are governed in accordance with the laws of the state of New Hampshire.

c.    On information and belief, Defendant Markel underwrites specialty commercial insurance policies on a national basis, with regional sales personnel dedicated specifically for New Hampshire residents.   Markel's wholly owned subsidiary, Markel Service, Incorporated, is licensed with the New Hampshire Secretary of State to conduct business as a foreign for-profit corporation and is described as an insurance brokerage.

d.    Markel has been the alter ego of its wholly owned subsidiary, Markel CATCo, from the time that Markel CATCo was formed, including, without limitation, with respect to Markel's control of Plaintiff's allocation of incentive payments to

Markel CATCo employees, Markel CATCo's purported enforcement of the Employment Agreement, and the termination of Belisle's employment from Markel CATCo.  Moreover, Markel assumed control of the Board of Directors of Markel CATCo in order to terminate Belisle's employment with Markel CATCo in breach of the Employment Agreement.

e.   Markel published defamatory statements regarding Belisle to a global audience, causing harm to the personal reputation of Belisle, a current part time and former full time New Hampshire resident, and to the business reputation of Belisle with respect to his professional and personal acquaintances.

13.   Venue is proper in the District of New Hampshire because jurisdiction is exclusively vested in the federal and state courts of New Hampshire pursuant to Section 16.1 of the Employment Agreement.  In addition, venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2, 3), and 1391(c)(3) because a substantial part of the events giving rise to the claim occurred in this district, because Defendants Markel and Markel CATCo are subject to personal jurisdiction in this district with respect to this action, and because Defendant Markel CATCo is not resident in the United States.

## STATEMENT OF FACTS

### A.   *Plaintiff's Employment Agreement.*

14.   Plaintiff conceived of, and participated in the establishment of, CATCo in July 2010, in conjunction with owner QIC, pursuant to an agreement that provided for 45% of all profits to belong to Plaintiff and 55% to QIC.  In each of the first six years of its existence, CATCo averaged double digit annual returns for its investors.  Based upon Plaintiff's hard work in conjunction with his team, his proprietary strategies, and the strong investor and customer

relationships he earned and maintained, Plaintiff turned his vision into a highly successful and profitable company.  When offered a sales price of $205,000,000 by Markel in 2015, Plaintiff and QIC agreed to the sale of CATCo to Markel.

15.     On September 9, 2015, QIC completed the sale to Markel of substantially all of the assets of the two related companies that Plaintiff and QIC had founded – CATCo Investment Management Ltd. ("CATCo") and CATCo-Re Ltd.  CATCo was an insurance-linked securities investment manager and reinsurance manager focused on building and managing highly diversified, collateralized retrocession and reinsurance portfolios covering global property catastrophe risks.  CATCo-Re Ltd. was a provider of reinsurance protection.

16.     Given Plaintiff's personal role in the success of CATCo, as well as his network of relationships with securities brokers, reinsurance brokers, investors and customers, Markel wished to keep Plaintiff in CATCo's employ.  Indeed, Markel trumpeted in its press release that, "[t]he existing CATCo management team, led by Chief Executive Officer Tony Belisle, will take on commensurate roles at Markel CATCo …" operating from Bermuda under Markel's ownership. Accordingly, Markel caused the newly formed Markel CATCo to enter into an Employment Agreement with Plaintiff, whereby he was named Chief Executive Officer of Markel CATCo.  Markel CATCo contracted to pay Plaintiff a base salary of $1,000,000 per year and to pay multi-million dollar incentive payments if he remained through certain target dates. More specifically, Plaintiff would receive both a Continued Service Element ("CSE") bonus and a Performance Element ("PE") bonus (the "Incentive Payments") if he (1) complied with the terms of the Employment Agreement; (2) complied with the terms of a separate noncompetition agreement; and (3) remained actively and continuously employed in good standing with Markel CATCo during a specified Retention and Performance Period of January 1, 2016 to

December 31, 2018.  *Id.* Schedule 1.  On June 1, 2017, Plaintiff's Employment Agreement was extended during its term for two additional years, but with no additional CSE or PE payments. However, the intent was for Ms. Fredricks to assume sole CEO responsibility for the Markel CATCo set of companies and for the Plaintiff to develop new investment funds that would result in a separate employment agreement.  Markel was highly motivated for Plaintiff to extend his contract by two additional years as it alleviated any concerns that Markel CATCo's investors would exit the Markel CATCo investment fund when Plaintiff's employment ended.

17.    With respect to the CSE, at the time of sale Plaintiff was given a total gross aggregate sum of $50,000,000.  Plaintiff allocated $12,500,000 of this amount to his team of other Markel CATCo employees.  Plaintiff was entitled to the balance after he allocated to his team members, to wit:  a total gross aggregate sum of $37,500,000, of which he was to earn one-third (i.e. $12,500,000) on each of the following specified "vesting dates" -- December 31, 2016; December 31, 2017; and December 31, 2018.  Each $12,500,000 installment of the CSE was to be paid within thirty calendar days after the applicable vesting date (i.e. January 30, 2017; January 30, 2018; and January 30, 2019, respectively).  *Id.*

18.    With respect to the PE, Plaintiff (and, at his discretion, other Markel CATCo employees) was entitled to a total gross aggregate sum calculated as $50,000,000, which would be raised or lowered based upon a multiplier that was calculated based upon the fee income generated by Markel CATCo during the Retention and Performance Period.  The official multiplier was determined in December of 2018 as 1.55, so that the total PE was $77,500,000. The plaintiff allocated $17,050,000 to his staff and another $7,000,000 to Ms. Fredricks for a total allocation to other Markel CATCo employees of $24,050,000.  This left the Plaintiff with a PE of $53,450,000 which was fully vested as of December 31, 2018 and payable no later than

January 30, 2019. *Id.* Schedule 1. Markel was fully aware that Plaintiff shared his PE bonus with other employees: Markel approved the allocations, and Markel CATCo Human Resources administered the payments. In addition, Markel's Co-Chief Executive Officer Richard R. Whitt, III, once remarked, "I have done a lot of deals over the years and I have to say I respect how you have shared 'the wealth' with the people that helped you build the business."

19.     The Employment Agreement provides that Plaintiff would not be entitled to receive unearned or unpaid CSE or PE payments in the event that Markel terminated Plaintiff "for Cause" on or before December 31, 2018 (the final vesting date). *Id.*

20.     The Employment Agreement defines "Cause," in pertinent part, as "failure to adhere to the Company's or any of its affiliates' applicable corporate codes, policies or procedures, as in effect or amended from time to time." *Id.* The Employment Agreement further specifies that Markel CATCo would not terminate Plaintiff's employment unless it first gave Plaintiff notice of, and a reasonable opportunity to cure, any curable grounds for termination. *Id.*

21.     At all times during the Retention and Performance Period, Plaintiff (1) complied with the terms of the Employment Agreement; (2) complied with the terms of a separate noncompetition agreement; and (3) remained actively and continuously employed in good standing with Markel CATCo.

22.     The Plaintiff and Ms. Fredricks consistently demonstrated the highest levels of success in performing their duties. At the time that Plaintiff had vested in all due payments, the combined assets under management ("AuM") of the funds had grown to $6.2 billion from $2.6 billion at the time of the sale of CATCo to Markel. This was largely due to the accomplishments of Plaintiff and Ms. Fredricks, who travelled extensively worldwide to raise $2.3 billion of new capital in the Fall of 2017 and an additional $600 million during 2018. This has been quoted as

one of the largest individual capital raises in the Insurance Linked Securities ("ILS") market history.  Not only did Plaintiff and Ms. Fredricks perform their jobs well, their capital raising achievements were unprecedented in the history of their industry.

**B.    Mr. Belisle's Successor.**

23.    In May 2016, Markel CATCo hired Alissa Legenza Fredricks as a Senior Actuary, working out of Markel CATCo's office in Wellesley, Massachusetts.

24.    Ms. Fredricks is extremely accomplished and skilled in astrophysics, actuarial science and catastrophe risk modeling, among other things; and it quickly became clear to many at Markel CATCo and Markel that she had the potential for significant promotions to leadership positions.   In July 2016, Plaintiff discussed with Ms. Fredricks the possibility of moving to Bermuda to ultimately assume the role of Chief Executive Officer – Bermuda.   As early as December 2016, Plaintiff identified Ms. Fredricks as his likely successor in an email to Markel Co-CEO Mr. Whitt.

25.    In March 2017, Ms. Fredricks rented a residence in Bermuda in order to work in Markel CATCo's Bermuda office, because of her promotion to the role of Chief Risk Officer.

26.    Thereafter, the officers of Markel CATCo and Mr. Whitt discussed having Ms. Fredricks assume the role as Chief Executive Officer – Bermuda by the end of 2017. Consistent with those conversations, Ms. Fredricks was formally appointed as Chief Executive Officer – Bermuda in November 2017.

27.    Under an addendum to Ms. Fredricks' Employment Agreement (the "Fredricks Addendum"), Ms. Fredricks was entitled to receive various incentive payments granted by Plaintiff from his Incentive Payments.  Fredricks Addendum, attached as Ex. 2.  For example, she was entitled to receive a CSE on the following specified "vesting dates" -- December 31,

2018; December 31, 2019; and December 31, 2020.  Each installment was to be paid within thirty calendar days after the applicable vesting date (i.e. January 30, 2019; January 30, 2020; and January 30, 2021, respectively).  *Id.*  The total amount of the bonuses was $450,000.  As with other key employees and as explained above, the CSE bonuses were granted by Plaintiff from his own CSE to certain Markel CATCo employees either at the time of the sale or, for an employee who joined later, shortly after that employee was hired.

28.     Also under the terms of the Fredricks Addendum, Ms. Fredricks was entitled to receive a Retention Bonus of $7,000,000 to be paid in full by March 31, 2019.  This Retention Bonus required Ms. Fredricks to remain continuously employed and in good standing with Markel CATCo up to and including March 31, 2021.  If Ms. Fredricks left the company prior to March 31, 2021 then she would have to return any unearned portion of the Retention Bonus, as determined on an after-tax basis.  However, if Ms. Fredricks were terminated without cause then she would immediately become fully vested in her $7,000,000 Retention Bonus and also in the unpaid balance of her CSE bonuses of $450,000.

29.     All CSE, PE and Retention Bonuses payable to staff were granted by Plaintiff from his own CSE and PE Bonuses with Markel's full knowledge and consent.  Plaintiff notified Markel Co-CEO Richard Whitt of allocations from his own funds to his team members, and Mr. Whitt always agreed, including with regard to Plaintiff's grant of the $7,000,000 Retention Bonus to Ms. Fredricks.

### C.     *The Inquiry.*

30.     As with other companies in the same market, Markel CATCo annually established loss reserves following catastrophic insured loss events through a complex proprietary process involving actuarial modeling and computations.  In 2017, Markel CATCo, again like other funds

in the same market, experienced so-called loss creep in its reserves due to several unpredictable natural catastrophes, including without necessary limitation Hurricanes Harvey, Irma, Maria, and the unprecedented 2017 wildfires in California.  These natural disasters required Markel CATCo, and others, to modify their loss reserves in late 2017 and throughout 2018.  Markel CATCo recalculated the necessary loss reserve, and obtained approval of the new loss reserve from the Company's auditors, KPMG.  In addition, the loss reserves were presented to Markel Co-Chief Executive Officer Richard R. Whitt, III and to the board of directors of both the private and public funds managed by Markel CATCo, and all agreed that the loss reserve methodology was sound and that the loss reserves were sufficient based on the industry loss knowledge available at that time.

31.     On information and belief, on or about November 30, 2018, Markel was contacted by U.S. and Bermuda authorities with inquiries regarding loss reserves recorded in late 2017 and early 2018 at Markel CATCo (collectively,  the "Inquiry").  Markel CATCo, a Bermuda entity, received no comparable inquiry, and Markel shared information only sparingly with Plaintiff and other members of Markel CATCo Management.  Markel did not immediately inform Plaintiff, Ms. Fredricks, or others at Markel CATCo of the Inquiry.  Instead, on or about December 4, 2018, without notice to Markel CATCo Management, Markel General Counsel Richard Grinnan traveled to Bermuda along with attorneys Christopher Gunther and David Zornow from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), whom Markel retained to conduct an internal review at Markel CATCo on Markel's behalf.  Markel also brought along one or more employees of IT vendor Consilio to image devices such as laptops and cell phones in the possession of the Markel CATCo employees.  On the afternoon of December 4, 2018, without any meaningful advance notice, the representatives from Skadden and Markel arrived at Markel

CATCo, demanded to meet with the entire staff, and immediately began what they described as an "internal review."

32.     Plaintiff was not in Bermuda initially on December 4, 2018 but traveled there that day from the United States upon learning of these events.

33.     The Markel and Skadden representatives, without disclosing that they would be imaging personal communications and communication modes, e.g., WhatsApp, and without suggesting that the employees had a choice, demanded that all employees, including Plaintiff, surrender their personal phones and other business and personal electronic devices, to be imaged and/or searched immediately.   Based on these demands and under the mistaken belief that they had no choice in the matter, Plaintiff and Ms. Fredricks (among others) provided their personal smartphones and other personal and company-owned devices to Consilio for imaging, believing that the imaging on the personal cell phones would be limited to company accounts and would not be extended to personal communications, e.g., via text or WhatsApp.

34.     Markel CATCo Management inquired of Markel Management whether Markel CATCo should retain its own counsel, but was discouraged from doing so, purportedly because Skadden was much more up to speed.   This was consistent with Markel's alter ego role with Markel CATCo. Markel CATCo Management logically inferred that Skadden would protect the interest of both entities, which Markel CATCo Management understood to include the investors in the funds that Markel CATCo managed.   In fact, Skadden was specially retained to conduct an "internal review" on behalf of Markel, and Markel was more interested in its own image than in any adverse effect on its wholly owned subsidiary Markel CATCo, or the funds that Markel CATCo managed.

35.     Despite the fact that no public announcement was required, Markel indicated its intention to announce publicly that Markel CATCo was under investigation by an unidentified department of the United States Government.   Markel CATCo's Management as well as the Boards of the public and private funds managed by Markel CATCo voiced the view that no public announcement was required or should be made, particularly given that such an announcement would be against the interests of the investors in the two funds managed by Markel CATCo.   Markel nonetheless issued a press release on December 6, 2018, gratuitously disclosing the existence of the Inquiry, and stressing that the Inquiry did not "involve other Markel Corporation companies" and that "outside counsel has been retained to conduct an internal review."   Markel's issuance of the press release was thus over the objections of Markel CATCo Management and the Directors of the two funds managed by CATCo.   Although Markel disclosed the identity of the United States agency involved in the Inquiry to numerous individuals and entities outside Markel and Markel CATCo, including the Boards of the funds managed by Markel CATCo, and the latter's trustee, outside law firm, auditor and fund administrator, they have yet to make that disclosure in a public statement.   Plaintiff therefore refrains from doing so here.

36.     In the first trading day following the December 6 announcement Markel's stock price dropped nearly 9%, representing more than $1 billion of market capitalization; and shareholder lawsuits were filed against Markel.   Further, Markel CATCo's publicly traded fund was severely impacted with the ordinary share price dropping nearly 40% in one day.

37.     Plaintiff fully cooperated with the internal review and participated in interviews with Skadden lawyers as and when requested, but neither Plaintiff nor Ms. Fredricks was permitted to participate in the Inquiry itself.   Despite Plaintiff's role as a founding principal of

CATCo and Chief Executive Officer of Markel CATCo, Markel did not provide him – and indeed, to this day still has not provided him – with more than cursory information about the scope, progress or status of the Inquiry.

38.     Markel's unwillingness to involve either Plaintiff or Ms. Fredricks in the Inquiry was short sighted and contrary to the best interests of Markel CATCo, the investors in the two funds managed by Markel CATCo, and the Markel CATCo employees and management team, including Plaintiff.  Nevertheless, Markel discouraged the efforts of Plaintiff and Ms. Fredricks to participate in the Inquiry, even on their own behalf.

### D.     *Markel's Efforts to Avoid the Impending Obligation to Pay Plaintiff $65,950,000.*

39.     As Markel's own stock price fell nearly 9% the day after the announcement, representing more than $1 billion in market valuation, and continued to fall by nearly 17% throughout December 2018, Markel's executives, including Co-CEO Whitt and General Counsel and Chairman of Markel Corp.'s Board Richard Grinnan, requested that Plaintiff delay or forfeit the incentive CSE and PE compensation payments that were scheduled to vest on December 31, 2018.

40.     On December 13, 2018, during a telephone call between Plaintiff, Whitt, and Grinnan, among others, Whitt expressed "concerns" about the "optics" of Plaintiff receiving his Incentive Payments in light of the Inquiry.  However, Whitt stated that all Markel CATCo employees, specifically including Ms. Fredricks, would "definitely" receive their Incentive Payments per their employment agreements.  Whitt then confirmed that the Plaintiff could communicate confirmation of the Incentive Payments to the entire staff, including Ms. Fredricks, immediately following this telephone call, which Plaintiff did.  Plaintiff and Whitt agreed to discuss possible deferral of the Plaintiff's Incentive Payments shortly thereafter.

41.     On December 28, 2018, Markel sent Plaintiff a proposed amendment to the Employment Agreement whereby Plaintiff would potentially forfeit, based on the findings of the Inquiry, or defer the Incentive Payments that were scheduled to vest just two days later, on December 31, 2018.  Plaintiff rejected the proposed amendment.

42.     On December 31, 2018, Plaintiff's Incentive Payments fully vested.  As a result, Markel owed Plaintiff a CSE payment of $12,500,000, and a PE payment, after application of a multiplier of 1.55, of $53,450,000 (the additional $24,050,000 that would have been payable to Plaintiff having been voluntarily allocated by him to other members of the Markel CATCo management team).  Both sums were payable on or before January 30, 2019.

43.     On January 4, 2019, during a telephone call between Plaintiff, Whitt, and Grinnan, Whitt again requested that Plaintiff delay his Incentive Payments.  However, Whitt, once again, acknowledged that Plaintiff's CSE and PE were fully vested, without possibility of forfeit, and promised that Markel would pay the Incentive Payments on or before January 30, 2019, if the Plaintiff insisted.

44.     Based on Markel's request and continued promise conveyed through Whitt that it would comply with its legal obligations to Plaintiff, on January 6, 2019 Plaintiff conveyed an offer to Markel that he would agree to defer receipt of a portion of the Incentive Payments (the "January 6 Proposal").  Whitt did not respond for over one week.

45.     Plaintiff made the January 6 Proposal, and otherwise conducted the communications and negotiations regarding his Incentive Payments, in good faith.  The same is not true for Markel.  At some point during the negotiations, Markel decided that, instead of deferring payment, as it had repeatedly represented was its goal, Markel was going to find an excuse to avoid making the Incentive Payments to Plaintiff altogether.

46.     By means of an unauthorized and unlawful invasion of Plaintiff's privacy, Markel found its purported justification for depriving Plaintiff of tens of millions of dollars that were due and owing to him:  On or shortly after December 4, 2018, Markel, with the assistance of vendors, accessed and then reviewed personal and private communications on electronic devices that they had demanded that Plaintiff and Ms. Fredricks provide for imaging, purportedly for use in the Inquiry.  This review occurred despite the fact that Defendants did not have permission from Plaintiff or Ms. Fredricks to conduct a review of their personal, non-company accounts on their personal devices.

47.     Markel's deceptive actions undertaken in an attempt to avoid its obligations to Plaintiff did not end there.  Representatives of Markel began asking probing questions, including of Ms. Fredricks, about portfolio strategy and how the business operates.  On information and belief, these actions were part of the coordinated scheme to remove Plaintiff and Ms. Fredricks from their positions and avoid making the Incentive Payments, while, at the same time, providing Markel with information about the portfolio strategy and how the Markel CATCo business operates in order to run the company after Plaintiff and Ms. Fredricks were no longer employed.

48.     As a further apparent step in this scheme, on January 11, 2019, Whitt had a lunch meeting with Robert Vrolyk, a member of Markel CATCo's Board of Directors.  Although the meeting was supposedly just an opportunity to get to know Vrolyk, during the meeting, Whitt expressed unfounded concerns regarding the sustainability of Markel CATCo's value.  Whitt also made inquiries concerning Plaintiff's "personal integrity."  Vrolyk informed Whitt that he had known Plaintiff for 32 years, and placed Plaintiff's integrity "above all others."  Despite the questions that appeared designed to elicit negative information regarding Plaintiff or create an

impression in Vrolyk's mind that Plaintiff engaged in some kind of wrongdoing, Whitt falsely informed Plaintiff that the meeting had been "purely social."  Vrolyk shared the meeting content with the Plaintiff and Nigel ("Niall") Barton, the Chairman of Markel CATCo's Board of Directors.  Both the Plaintiff and Barton were quite concerned over the questioning directed at Vrolyk by Whitt.

49.     On January 11, 2019, during a telephone call between Plaintiff and Whitt, Whitt stated that he had met with Vrolyk in a "purely social" visit. In addition, Whitt stated that he would agree to Plaintiff's January 6 Proposal.  Whitt further stated that before formalizing the proposal and the payment structure, Skadden first required one more interview with Plaintiff in Bermuda, concerning the Inquiry.  All of these statements were false and pretextual.

50.     On January 13, 2019, Markel Corp's Human Resources department informed all Markel CATCo employees, including Plaintiff, that they would receive their respective Incentive Payments on January 30, 2019.

### E.     *The Skadden "Interview".*

51.     On or about January 15, 2019, attorneys from Skadden contacted Plaintiff to schedule the interview addressed above.  Skadden disingenuously described the interview as a "follow-up" to earlier interviews between Skadden and Plaintiff concerning the Inquiry.

52.     Skadden scheduled an interview with Ms. Fredricks for later that same day.  Ms. Fredricks was also disingenuously informed by Skadden that the "interview" would be a "follow-up" to earlier interviews in which she participated, arising from the Inquiry.

53.     The "interviews" occurred on January 17, 2018.  Although each interview began with an initial, fairly high-level discussion regarding loss reserves, Plaintiff quickly realized that the meetings were not scheduled for the purpose of learning information about that topic.

Instead, Skadden informed Plaintiff that Markel or others on its behalf had accessed his personal communications without his knowledge, and, based on communications they had improperly accessed, accused Plaintiff of engaging in an undisclosed personal relationship with Ms. Fredricks.  Skadden claimed that the existence of the relationship was a violation of Markel's Code of Conduct and Plaintiff's Employment Agreements, although no such prohibitions existed in the Agreements or in the Code as it existed on December 31, 2018, which was the last Code provided to and signed by Plaintiff and Ms. Fredricks.  Skadden made similar accusations against Ms. Fredricks in their meeting later that morning.

54.     Markel and Skadden demanded that Plaintiff and Ms. Fredericks surrender their phones and other electronic devices a second time, to be imaged again.  Plaintiff and Ms. Fredricks were again told, incorrectly, that even if a device was personal – such as a personal smartphone that the employees had purchased with their own money – they were required to provide it to be imaged.  Based on these demands and under the continued, mistaken belief that they had no choice, Plaintiff and Ms. Fredricks provided their personal smartphones and other devices to Consilio for imaging.

### F.     *Markel's Code of Conduct.*

55.     Prior to January 1, 2019, Markel's Code of Conduct did not contain a provision prohibiting or discussing personal relationships between Markel employees.  *See* Ex. 3 (the "Pre-2019 Code of Conduct").  The existing Code of Conduct had a section regarding "Conflicts of Interest," but the text and examples made it clear that Markel's Pre-2019 Code of Conduct related to business relationships that could give rise to business conflicts of interest.

56.     At some time on or about December 4, 2018, after imaging Plaintiff's and Ms. Fredricks' personal cell phones, including their personal accounts on those phones, Defendants

became aware that Plaintiff and Ms. Fredricks had developed a personal relationship.   On December 31, 2018, Plaintiff's Incentive Payments fully vested and his Retention and Performance Period concluded.   Thereafter, Markel, without the knowledge of Markel CATCo Management or the Markel CATCo Board, purported to amend its own Code of Conduct, to which Markel subsidiaries were subject, to include "[h]aving a relationship with another Employee in the Company when one Employee directly or indirectly supervises the other Employee" as a potential or actual "Conflict of Interest."   *See* Ex. 4 (the "Substitute Code of Conduct").   The Substitute Code of Conduct bears the date January 2019 and appears to have been first posted online on January 7, 2019.   Plaintiff and Ms. Fredricks were never given the opportunity to review or sign the Substitute Code of Conduct, nor were they even aware of its existence before their termination, even though they were both officers and directors of Markel CATCo.   The provision regarding personal relationships did not exist in prior versions of the Code of Conduct, which Plaintiff and Ms. Fredricks did sign.

57.    At no time did any relationship between Plaintiff and Ms. Fredricks result in an improper conflict of interest, or create a situation that in any way interfered with or influenced Plaintiff's contribution to Markel, or impeded his ability to perform his work objectively and effectively.   To the contrary, the promotions of Ms. Fredricks discussed above were all in process before any personal relationship began, and Ms. Fredricks' Incentive Payment was not from Markel CATCo funds but was, rather, granted by Mr. Belisle from his own Incentive Payment, i.e., as he customarily did with his key team members, he reduced his own payment by causing a well-earned portion to be due to her.

58.    In addition, at the time of Ms. Fredricks' promotion to CEO - Bermuda, her salary was increased accordingly as prior to that time her salary was significantly less than many of her

direct reports.  At all times, any changes in salary for Ms. Fredricks were approved by Whitt and Human Resources ("HR") at Markel.  Further, Ms. Fredricks' most recent salary change was subject to a review of comparable roles at peer companies and was ultimately approved by both Whitt and Markel's HR and Compensation departments.  As such, Ms. Fredricks' salary changes were fair and appropriate for the significant leadership role she had assumed at Markel CATCo, which Markel's Compensation team had confirmed by means of an independent review.

### F.    Plaintiff's Termination.

59.    On January 18, 2019, through corporate maneuvering that was not shared with Plaintiff or Ms. Fredricks (despite the fact that they were both directors of Markel CATCo), Markel caused the election of five new, additional members to the Markel CATCo board, whose terms were to commence immediately.  All of the new members were under the control of Markel.  Markel CATCo then convened a meeting of the Board of Directors, five of whom were directly controlled by Markel and four of whom, including Plaintiff and Ms. Fredricks, were not.

60.    Notwithstanding the provision in Mr. Belisle's Employment Agreement whereby Markel was obligated to give him notice and a reasonable opportunity to cure before terminating his employment, Plaintiff and Ms. Fredricks were informed during the Board meeting that they were terminated, effective immediately, and that their respective Incentive Payments would not be paid.  The two actual Markel CATCo Board members apart from Plaintiff and Ms. Fredricks declined to vote, and the terminations were carried out by the newly appointed Markel-sponsored "directors."

61.    Plaintiff offered to "cure" any perceived conflict of interest (although no such conflict existed) by resigning immediately, while Ms. Fredricks could continue on as Chief Executive Officer of Markel CATCo.  With Plaintiff departed from the employ of Markel

CATCo, no conflict could possibly exist.  Plaintiff expressed concerns to the newly constituted Board that, given the crucial roles that he and Ms. Fredricks played, Markel CATCo could be rendered unable to survive, and the investors in the funds it managed harmed, if he and Ms. Fredricks were both terminated.  The newly appointed directors ignored the entreaty, and denied Plaintiff his contractual opportunity to cure the purported grounds for the termination of his employment.

62.    On January 18, 2019, Plaintiff received a Notice of Termination of Employment from Grinnan, which specified that Plaintiff had been terminated for "Cause, as defined in [his] Employment Agreement."   The notice includes the baseless claim that Plaintiff "breached the Employment Agreement prior to December 31, 2018 and [was] not in good standing with [Markel CATCo] as of that date."  Therefore, Grinnan concludes, Plaintiff was ineligible for, and would not receive, any unpaid Incentive Payments – despite the facts that the payments had already vested weeks before the termination and that the Code of Conduct as it existed on the vesting date contained no prohibition against personal relationships.

63.    Markel provided a similar message to Ms. Fredricks, and has denied her any of her unpaid Incentive Payments, although, as the subordinate in the personal relationship, her conduct could not have been a terminable offense even under the hastily revised January 2019 Substitute Code of Conduct.

64.    Later that same day, Markel issued a press release in which Markel falsely stated that Plaintiff had violated Markel policies as a result of his relationship with Fredricks.  Markel did not disclose that the Code of Conduct had just been amended days earlier in January 2019 to provide a previously non-existent basis for terminating Plaintiff's employment, or that the

Substitute Code of Conduct had never been shown to or signed by Plaintiff.  The press release further implied – falsely – that Plaintiff's termination was also somehow related to the Inquiry.

65.     On information and belief, on or about January 29, 2019 Markel CATCo convened a call with over 100 attendees, including investors and staff  in the funds managed by Markel CATCo.  The President and Chief Underwriting Officer of Markel Global Reinsurance, Jed Rhoads, who was appointed as the interim head of Markel CATCo, began the call by stating that no questions would be taken and that the purpose was to address why Plaintiff's and Ms. Fredricks' employment had been terminated.  Markel representatives went on to say that during the Inquiry, Markel uncovered the fact that Plaintiff and Ms. Fredricks had engaged in an undisclosed personal relationship, including during a period when Plaintiff was setting her salary and bonuses.  No mention was made that the salaries and bonuses were approved by Markel, that Ms. Fredricks' salary upon being appointed CEO-Bermuda had been determined after a survey of comparable positions, or that the bonuses were from Plaintiff's own funds, not those of Markel or Markel CATCo.  Nor did the Markel representatives note that the bonuses were fully in line with Ms. Fredricks' position as Markel CATCo CEO-Bermuda, the highest position behind Plaintiff's own and one for which Ms. Fredricks was selected before any personal relationship existed.

66.     These statements and others that Markel and its agents have made are false and misleading, and portray a supposed conflict of interest that did not occur and a violation of a corporate policy that did not exist.

67.     Defendants' conduct was wanton, malicious, motivated by ill will and hostility and calculated to lead to a financial gain of tens of millions of dollars.  Defendants (a) developed a concerted plan, after invading Plaintiff's privacy, to alter Markel's Code of Conduct

surreptitiously as a pretextual basis to terminate Plaintiff's employment without notice or opportunity to cure, thereby denying him substantial benefits under his Employment Agreement; and (b) implemented the plan immediately after Plaintiff declined to forego voluntarily the Incentive Payments to which he was contractually entitled.   Moreover, Defendants then proceeded to invade his privacy further by publicly announcing the occurrence of a private personal relationship, falsely stating that the relationship constituted a conflict of interest in violation of a policy that did not exist, and falsely implying that the termination was also related to the Inquiry.  All of this conduct was undertaken in an apparent attempt to cover up the actual monetary reason for Plaintiff's termination, and with the apparent goal of clouding his reputation to prevent or materially impair his ability to compete with Markel CATCo after his termination.

## COUNT I
## BREACH OF CONTRACT (MARKEL AND MARKEL CATCo)

68.     Plaintiff incorporates by reference Paragraphs 1 through 67 as if set forth fully herein.

69.     Beginning on September 9, 2015, Plaintiff undertook employment with Markel CATCo pursuant to the terms of the Employment Agreement.

70.     The Employment Agreement is a valid and enforceable agreement governed by the laws of the State of New Hampshire.  *See* Employment Agreement § 16.1.

71.     Plaintiff performed his obligations under the Employment Agreement in every material respect, up through and including December 31, 2018.

72.     Pursuant to the Employment Agreement, Plaintiff's Incentive Payments vested on December 31, 2018, and Markel CATCo was obligated to pay them on or before January 30, 2019.

73.     Markel CATCo has not remitted the Incentive Payments to Plaintiff and has repudiated its obligations to pay the Incentive Payments, thereby breaching the Employment Agreement and causing harm to Plaintiff as a result.

74.     In addition, Markel CATCo breached the Employment Agreement by terminating Plaintiff without providing him with notice and an opportunity to cure his alleged—and unfounded—breach of the Employment Agreement.

75.     Markel is a third-party beneficiary of the Employment Agreement and therefore bound by its terms.  *See* Employment Agreement § 14.1.

76.     As described above, by virtue of its conduct from the time that Markel CATCo was formed, Markel became an alter ego to its wholly owned subsidiary Markel CATCo. Among other conduct, Markel assumed control of the Markel CATCo Board of Directors in January 2019 in order to terminate Plaintiff's employment and avoid the hefty Incentive Payments owed to him as of December 31, 2018, and to control the messaging surrounding the termination in a manner designed to ensure that Plaintiff could not compete with Markel CATCo after the termination.

77.     Markel, through its alter ego Markel CATCo, materially breached Plaintiff's Employment Agreement (a) by causing Markel CATCo to repudiate its obligation to pay Plaintiff's Incentive Payments under the Employment Agreement, and (b) by terminating Plaintiff's employment without providing him with notice and an opportunity to cure his alleged—and unfounded—breach of the Employment Agreement.

78.     Alternatively, Markel's control of Markel CATCo created an agency relationship whereby Markel CATCo's acts as an agent are attributable to Markel as the principal.

79.     Markel CATCo acted as Markel's agent with respect to Markel CATCo's breaches of the Employment Agreement, and Markel is liable for those breaches as Markel CATCo's principal.

80.     In sum, Markel is liable along with Markel CATCo for the breach of Plaintiff's Employment Agreement either because Markel CATCo is the alter ego of Markel CATCo or because Markel was the principal on whose behalf its agent Markel CATCo acted in breaching the Employment Agreement.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING (MARKEL AND MARKEL CATCo)

81.     Plaintiff incorporates by reference Paragraphs 1 through 80 as if set forth fully herein.

82.     In every New Hampshire agreement, there is an implied covenant that the parties will act in good faith and fairly with another.  Contracting parties are prohibited from behaving in a manner inconsistent with the parties' common purpose and justified expectations.

83.     In particular, parties vested with discretion under a contract are obligated to act in good faith with respect to the exercise of that discretion and are prohibited from exercising that discretion to deprive a counterparty of the substantial value of the contract.

84.     If, for any reason, Markel and/or Markel CATCo is found not to have breached the Employment Agreement, such entity or entities nonetheless breached its/their covenant of good faith and fair dealing to Plaintiff.

85.     Markel is a third-party beneficiary of the Employment Agreement.  *See* Employment Agreement § 14.1.  Plaintiff was obligated to comply with all applicable policies and procedures of Markel CATCO and its affiliates, including Markel.  *Id.* § 3.2(d).

86.     Markel, acting through its agent Skadden, violated Plaintiff's privacy by informing him that he was required to turn over his personal cell phone for imaging, while causing him to believe that only company accounts would be imaged.  Without notice or authorization, Markel, acting through its agent Skadden, caused Plaintiff's personal accounts on his personal cell phone to be imaged.  Markel and Markel CATCo then used that improperly obtained personal data as a pretextual basis to terminate Plaintiff's employment with Markel CATCo.

87.     In addition, Markel replaced the Pre-2019 Code of Conduct with the Substitute Code of Conduct to include personal relationships as conflicts of interest, without notice to the Markel CATCo directors or officers including Plaintiff.

88.     Markel and Markel CATCo then terminated Plaintiff's employment without notice and opportunity to cure and denied him the Incentive Payments that had already vested on December 31, 2018 on the basis that he had violated the Substitute Code of Conduct, about which he knew nothing and which he had never signed.

89.     Further, Markel and Markel CATCo announced publicly (a) that Plaintiff's employment was being terminated for engaging in a personal relationship, thereby further violating his privacy rights; (b) contending that the relationship violated company policy, when the policy had only been modified after January 1, 2019 to include personal relationships; and (c) that the Inquiry was occurring simultaneously with the termination, thereby falsely implying a relationship between the termination and the Inquiry.

90.     Markel's and Markel CATCo's conduct as alleged above, individually and collectively, violates the implied covenant of good faith and fair dealing.

91.     Markel and Markel CATCo's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, injury to Plaintiff, including but not limited to, failure to pay the Incentive Payments which he is due under the Employment Agreement, injury to reputation, and distress and embarrassment attendant upon the invasion of his privacy rights.

**COUNT III**
**UNJUST ENRICHMENT (MARKEL AND MARKEL CATCo)**

92.     Plaintiff incorporates by reference Paragraphs 1 through 91 as if set forth fully herein.

93.     Markel purchased CATCo, of which Plaintiff was the CEO, from QIC, and, in connection therewith, caused the new entity, Markel CATCo, to enter into an Employment Agreement with Plaintiff that was of mutual benefit to Plaintiff on the one hand, and Markel CATCo and Markel on the other.

94.     Markel CATCo is a wholly owned subsidiary of Markel, such that Markel benefits financially through Markel CATCo as a result of Plaintiff's activities.  For example, in conjunction with Ms. Fredricks, Plaintiff raised $2.3 billion in the Fall of 2017 for Markel CATCo's private and public funds.

95.     Markel, as the owner of Markel CATCo, realized substantial benefits from Plaintiff's performance under the Employment Agreement from September 2015 through January 2019, reflected in the annual revenue of Markel CATCo from 2015 through 2019.

96.     Markel, either itself or through its subsidiary and alter ego Markel CATCo, has retained for its own benefit the Incentive Payments due to Plaintiff.

97.     In light of Markel's misconduct culminating in the termination of Plaintiff's employment, it is unconscionable for Markel to retain the benefit of Plaintiff's services and to withhold the Incentive Payments from Plaintiff.  Alternatively, it is unconscionable for Markel to

passively accept through Markel CATCo the benefits of Plaintiff's services and to retain Plaintiff's Incentive Payments.

98.    Markel and Markel CATCo have been unjustly enriched at the expense of Plaintiff by their wrongful conduct.

**COUNT IV**
**DEFAMATION (MARKEL AND MARKEL CATCO)**

99.    Plaintiff incorporates by reference Paragraphs 1 through 98 as if set forth fully herein.

100.    Plaintiff and Ms. Fredricks are private figures.

101.    On January 18, 2019, Markel issued a press release stating that Plaintiff and Ms. Fredricks violated "Markel policies relating to an undisclosed personal relationship," and were "no longer with the company" following "prompt action . . . taken" by Markel.  In addition, the January 18, 2019 press release sandwiched these statements regarding Plaintiff and Ms. Fredricks' termination, which constitute an invasion of privacy as discussed herein, between references to the Inquiry, even though the personal relationship and the terminations are entirely unrelated to the Inquiry.

102.    Markel published the press release on its website at http://www.markelcorp.com/About-Markel/NewsRoom/Reuters2383940; issued the press release to PRNewsire, Reuters, and an unknown number of other media organizations for further public dissemination; and filed the press release with the Securities and Exchange Commission's EDGAR system on an 8-K Form.

103.    On information and belief, Markel and others acting at its behest (including new officers of Markel CATCo) have likewise made oral statements to third parties, including investors in the funds managed by Markel CATCo, that Plaintiff and Ms. Fredricks were

terminated because they breached their respective employment agreements, engaged in actions that subjected them to a conflict of interest, and violated Markel's code of conduct.  These oral statement have occurred, among other times, during a call with investors on or about January 29, 2019.

104.    Defendants' press release and oral statements regarding Plaintiff's termination were false and defamatory, because Plaintiff and Ms. Fredricks did not violate any Markel policy in existence prior to January 1, 2019, and did not engage in actions that gave rise to a conflict of interest.

105.    Defendants' press release and oral statements were also false and defamatory by omission, inasmuch as they state that Plaintiff and Fredricks violated Markel's policies, while omitting that:

    a.  With knowledge of Plaintiff and Fredricks' relationship, Markel created, but did not give prior notice of the Substitute Code of Conduct, which had been modified to require disclosure of personal relationships; and

    b.  Markel did not notify either Plaintiff or Ms. Fredricks that it had created the Substitute Code of Conduct to prohibit undisclosed relationships, notwithstanding that Markel knew of their relationship.

106.    Plaintiff and Fredricks' relationship was not in violation of Markel's Code of Conduct, certainly as it existed prior to January 2019, because the Substitute Code of Conduct was never properly adopted, nor was it accepted by Plaintiff or Ms. Fredricks. Defendants' statements were also false and/or false by omission to the extent that they state that Plaintiff and Ms. Fredricks were terminated in the course of Markel's internal review related to the Inquiry,

while omitting the fact that the relationship and termination were entirely unrelated to the Inquiry.

107.    Defendants' written and oral statements were intentional, were made with actual malice, ill will, and hostility, and were maliciously undertaken for their own financial gain at the expense of Plaintiff.

108.    Each of Defendants' misrepresentations and misleading statements, and all of them collectively, have held Mr. Belisle up to scorn, ridicule, disgrace or contempt in the mind of a considerable and respectable segment of the community, and have damaged Mr. Belisle's reputation and business opportunities.

109.    At the time the statements were made, Defendants knew, or at very least should have known, that the statements were false and/or that they omitted material information such that they were misleading.

110.    Defendants' statements and omissions have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.

### COUNT V
### INVASION OF PRIVACY (MARKEL AND MARKEL CATCO)

111.    Plaintiff incorporates by reference Paragraphs 1 through 110 as if set forth fully herein.

#### A.    Intrusion Upon Seclusion and Solitude

112.    On or about December 4, 2018, Markel and Skadden demanded that Plaintiff surrender his cell phone and other electronic devices to be imaged and/or searched.  Markel and Skadden disingenuously represented that even if a device was personal, Plaintiff was required to

provide it for imaging, and led Plaintiff to believe that the imaging would be limited to corporate accounts on the devices.

113.    Based on these demands, Plaintiff provided his personal smartphones and other personal and company-owned devices to Markel's agents.  Plaintiff did not authorize the imaging or review of his personal, non-corporate accounts.

114.    On or about January 17, 2019, Markel and Skadden again demanded that Plaintiff make his personal smartphones available to Markel's agents for copying.  Again, based on the demand and disingenuous representations, Plaintiff provided his phone but did not authorize the imaging or review of his personal, non-corporate accounts.

115.    Plaintiff's smartphone includes extensive correspondence, documents, and information related to Plaintiff's private life that is entirely unrelated to either the Inquiry or to Plaintiffs' employment at Markel CATCo, and that he neither understood would be, nor authorized to be, imaged or reviewed.

116.    As a result of the prior imaging if not otherwise, Markel CATCo, and their agents knew that Plaintiff's smartphone contained extensive information concerning Plaintiff's private life that was entirely unrelated to either the Inquiry or Plaintiffs' employment at Markel CATCo.

117.    Defendant Markel CATCo and Markel acting as alter ego to Markel CATCo further invaded Plaintiff's privacy by unnecessarily and maliciously announcing that Plaintiff had been terminated because of a personal relationship that purportedly violated a Company policy that did not even exist at any relevant time.

118.    Plaintiff has been harmed by Defendants' intrusions upon his solitude and seclusion, both because his personal information was accessed without authorization and used as an unlawful basis to terminate his employment, and because his personal information was

unnecessarily and maliciously publicly announced in a manner designed to embarrass and interfere with his personal life and relationships.

B.  **Public Disclosure of Private Facts**

119.  Defendants discovered Plaintiff's personal relationship with Ms. Fredricks through review of Plaintiff's personal correspondence and documents.

120.  Plaintiff's personal relationship with Ms. Fredricks was private and is of no legitimate concern to the public.

121.  Defendants publicized Plaintiff's private personal relationship to the public at large through, among other means, issuing a press release, filing a form 8-K with the Securities and Exchange Commission, and making oral statements to Markel CATCo investors and employees.

122.  Plaintiff did not authorize or consent to Defendants' communication of his private personal relationship to the public at large.

123.  Plaintiff has been harmed by Defendants' public disclosure of private facts concerning Plaintiff, both because his private information was used as an unlawful basis to terminate his employment, and because it was publicly announced in a manner designed to embarrass and interfere with his family relationships.

C.  **False Light**

124.  Defendants' press release and oral statements regarding Plaintiff's termination were expressly false and defamatory, and/or false and defamatory by omission, as set forth above.

125.  At the time they were made, Defendants knew that the statements were false and/or that they omitted material additional information, which omissions caused the statements

to be misleading.    Defendants acted intentionally and maliciously.    Or, at a minimum, Defendants recklessly disregarded whether these statements were false.

126.    Defendants publicized these misrepresentations and misleading statements to the public at large through, among other means, issuing a press release, filing an 8-K, and making oral statements to Markel CATCo investors and employees.

127.    Plaintiff has been harmed by Defendants' conduct in publicly placing him in false light.

128.    Defendants' invasions of Plaintiffs' privacy through intrusion upon seclusion, unauthorized accessing and use of private facts, unnecessary public disclosure of private facts, and publicly placing Plaintiff in a false light have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.


## COUNT VI
## DECLARATORY JUDGMENT OF ABANDONMENT
## OF CONTRACTUAL OBLIGATIONS/PRIOR BREACH (MARKEL AND MARKEL CATCO)

129.    Plaintiff incorporates by reference Paragraphs 1 through 128 as if set forth fully herein.

130.    Beginning on September 9, 2015, Plaintiff undertook employment with Markel CATCo pursuant to the terms of the Employment Agreement.

131.    The Employment Agreement is a valid and enforceable agreement governed by the laws of the State of New Hampshire.  *See* Employment Agreement § 16.1.

132.    Markel is a third-party beneficiary of the Employment Agreement (*see* Employment Agreement § 14.1) and, by reason of its actions described above, an alter ego of

Markel CATCo.

133.    Plaintiff performed his obligations under the Employment Agreement in every material respect.

134.    On January 18, 2019, Markel CATCo terminated Plaintiff's employment, at Markel's behest, and unequivocally stated that it would refuse to perform its continuing obligations under the Employment Agreement, including, but not limited to, its obligations to pay the Incentive Payments to Plaintiff.

135.    Markel CATCo's refusal to pay the Incentive Payments, totaling $65,950,000, is a material breach of the Employment Agreement and, in combination with the termination of Plaintiff's employment without cause, comprises a complete abandonment of Markel CATCo's obligations under the Employment Agreement and a prior breach of the Employment Agreement excusing Plaintiff from all further performance.

136.    Pursuant to the Employment Agreement, Plaintiff agreed not to undertake any business opportunity adverse to Markel CATCo or Markel for a period of twenty-four months following his termination by Markel CATCo.  Employment Agreement § 8.4.

137.    By repudiating and abandoning their obligations under the Employment Agreement and committing a prior breach of the Employment Agreement, Markel CATCo and Markel are in total breach of the Employment Agreement with no possibility for future performance.

138.    In its January 18, 2019 Termination Letter, Markel CATCo asserted that Plaintiff remains subject to various continuing, post-termination obligations to Markel CATCo under the Employment Agreement "including, but not limited to, the confidentiality, non-compete, and non-solicit obligations."  Pursuant to the Employment Agreement, Markel was a third-party

beneficiary of certain of these obligations, in addition to being an alter ego of Markel CATCo. By virtue of Markel CATCo's and Markel's abandonment and prior breach, Plaintiff is excused from any further performance or forbearance under the Employment Agreement.

139.    Plaintiff has suffered harm and continues to be harmed by Defendants' contentions that he remains obligated to perform or forbear under the Employment Agreement.

140.    Because Defendants assert that Plaintiff remains subject to continuing obligations under the Employment Agreement notwithstanding Defendants' abandonment of their obligations, and Plaintiff therefore risks litigation from Defendants for breach of contract if he undertakes any new business activity that implicates the non-compete and non-solicit provisions of the Employment Agreement, an actual controversy exists between Plaintiff and Defendants, such that this matter is justiciable now pursuant to 28 U.S.C. § 2201.

141.    Plaintiff is entitled to a declaration that his post-termination obligations under the Employment Agreement, including but not limited to his covenant not to compete with Markel CATCo and Markel, are null and void.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor as follows:

a.     Awarding contractual damages to Plaintiff against both Defendants in the amount of the Incentive Payments and such other consequential damages as are appropriate;

b.     Awarding tort damages to Plaintiff against both Defendants for harm caused by Defendants' tortious actions, including without limitation emotional distress and injury to reputation;

c.      Awarding enhanced compensatory damages for Defendants' wanton and malicious tortious conduct;

d.      Awarding pre-judgment, post-judgment, and statutory interest to Plaintiff against both Defendants;

e.      Awarding attorneys' fees and costs to Plaintiff against both Defendants;

f.      Declaring that Plaintiff has no further obligations to either Defendant under the Employment Agreement;

g.      Ordering such other equitable relief as the Court deems just and proper, including additional determinations of the rights and responsibilities of the parties; and

h.      Awarding such other and further legal relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all claims so triable.

Respectfully submitted

ANTHONY BELISLE,

By his attorneys,


*/s/* Joan A. Lukey
Joan A. Lukey (N.H. Bar ID #16246)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000
joan.lukey@choate.com

Date: February 21, 2019

9129374