# Exhibit 1

DATED:  September  9, 2015


Markel CATCo Investment Management Ltd. (the "Company")

and

Anthony Belisle (the "Employee")


_____

EMPLOYMENT AGREEMENT

_____

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made this 9th day of September 2015

**BETWEEN:**

(1)     Markel CATCo Investment Management Ltd. (the "Company");

and

(2)     Anthony Belisle (the "Employee").

IT IS AGREED by such parties as follows, in consideration of the promises and mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by both parties:

1.      **Certain Definitions**

1.1     In this Agreement, including the Schedules, the following words and expressions shall, unless the context otherwise requires, have the following meanings:

| **Word or Expression** | **Meaning** |
|---|---|
| **"affiliate"** | with respect to a given entity (including the Company), any other entity that owns or controls, is owned or controlled by, or is under common ownership or control with, such entity; |
| **"Board"** | the board of directors of the Company; |
| **"Completion"** | the completion of the transactions contemplated by and pursuant to the Purchase Agreement; |
| **"Effective Date"** | the effective date of the Completion; |
| **"Insurance"** | insurance and reinsurance business; |
| **"Business Rules"** | any laws, regulations, requirements, codes of conduct, standards of best practice or any other rules published by the Bermuda Monetary Authority or any other regulatory authority having jurisdiction over the Company or the Employee, which may exist or relate from time to time in respect of the sale or placement of, or dealing or handling with, any Insurance, or any amendment, extension or variation of any Insurances, or the handling of monies or policy/product documents in relation to any Insurances, or any undertakings, commitments, obligations or responsibilities to any Regulatory |

1

Organization;

|  |  |
|---|---|
| **"Purchase Agreement"** | that certain agreement relating to the sale and purchase of the assets and business of CATCo Investment Management Ltd. and CATCo-Re Ltd., dated as of September 9, 2015, by and among the Company, Markel Corporation, CATCo Investment Management Ltd., and CATCo-Re Ltd. |
| **"Regulatory Organization"** | the Ministry of Finance, the Bermuda Monetary Authority and any sub-division thereof, and any other regulatory authority having jurisdiction over the Company or the Employee; |

## 2.  Employment and Term

2.1     During the Employment Period (defined below), the Company hereby employs the Employee, and the Employee hereby accepts employment with the Company, in that position and title specified in Schedule 1, and reporting to such person or position specified in Schedule 1 or such other person as the Company may designate, upon and subject to the terms and conditions of this Agreement.

2.2     The term of the Employee's employment pursuant to this Agreement shall commence upon the Effective Date and shall continue through and including December 31, 2018, unless the Employee's employment is earlier terminated pursuant to Section 9 (such period referred to as the "Employment Period").  If the Employee's employment with the Company continues beyond the Employment Period ("Post-Term Employment"), then unless the Company and the Employee negotiate and execute a new written employment agreement to govern any such Post-Term Employment, such Post-Term Employment shall be at-will, terminable by either party at any time for any or no reason with or without cost or advance notice, and the provisions of this Agreement shall not apply to such Post-Term Employment, provided that this Section 2.2 and Sections 8, 11, 12, 13, 14, 15, 16, 17, 18, 19 and Schedule 2 below shall continue in full force and effect in accordance with their respective terms as if (solely for purposes of such Sections) the Employment Period continued throughout the Post-Term Employment, and the Employee's employment shall not be considered to have terminated for purposes of any such Sections during the Post-Term Employment.

## 3.  Principal duties of the Employee

3.1     During the Employment Period, the Employee shall:

(a)     undertake and faithfully and diligently perform all such duties, and exercise such powers and functions, as may be assigned to or vested in the Employee from time to time by the Board;

(b)     use the Employee's reasonable efforts to achieve such targets, benchmarks and goals as are set by the Board for the promotion and growth of the Company;

(c)      at all times conform to the good faith and lawful directions of the Board;

(d)      devote the whole of the Employee's working time, attention and skills to the development of the Employee's business within the Company and to the affairs of the Company (as required by the Board); and

(e)      act at all times in the best interests, and promote and protect the interests, of the Company.

3.2    During the Employment Period, the Employee also shall:

(a)      stay properly apprised of all Business Rules relating to the performance of the Employee's obligations to the Company (as the case may be) under this Agreement, and relating to the conduct of business with and on behalf of ceding insurer clients or prospective ceding insurer clients of the Company or its affiliates and investors or prospective investors in the investment funds managed by the Company on behalf of whom the Employee is to act;

(b)      comply in all material respects with all Business Rules, whether such matters are binding on the Employee personally or the Company;

(c)      promptly disclose in writing to the Company, so far as the Employee is aware of the same, the nature of any personal interest of the Employee, whether direct or indirect, in any contract or proposed contract entered into by the Company; and

(d)      conduct the Employee's activities on behalf of the Company, and otherwise act, in compliance with all proper standards of corporate governance, and with all applicable policies and procedures of the Company and its affiliates, each as in effect or as amended from time to time.

3.3    The Employee shall immediately give to the Company full written details of all communications and correspondence the Employee may have with any Regulatory Organization whether in relation to this employment or any previous employment, subject to Section 11 below.

3.4    The Employee acknowledges the right of the Company, whether during the Employment Period or at any time after it has terminated, to notify and otherwise deal with any appropriate Regulatory Organization in connection with any conduct of the Employee which does not (or is alleged not to) comply with any Business Rules, or the spirit of such Business Rules.

3.5    Subject in each case to Section 11 below, if the Employee becomes aware of any circumstances which may or are likely to lead to a complaint or claim being made against the Company or any of its affiliates, or which may require notification to a Regulatory Organization, whether for negligence, breach of duty or otherwise, then the Employee shall immediately notify the Company in writing and, in respect of such complaint or claim, the Employee shall:

(a)     not admit or acknowledge any liability or responsibility;

(b)     provide such truthful details and reports as the Company may require; and

(c)     cooperate in full with all reasonable and lawful requests and instructions of the Company, professional indemnity insurers of the Company, or the relevant Regulatory Organization.

3.6     Without limiting the full observance by the Employee of the Business Rules, the Employee agrees that in the conduct of any business, the Employee will give a true, complete and accurate description of the risks involved to the relevant investor or prospective investor in the investment funds offered by the Company, and that, in relation to any investor, the Employee will act in such investor's best interests at all times.

4.      **Restriction on other activities by the Employee**

4.1     The Employee agrees that, during the Employment Period, the Employee shall not do any or all of the following (except with the prior written consent of the Board):

(a)     engage directly or indirectly in the conduct of any other commercial business;

(b)     be directly or indirectly concerned or interested in any business which is in competition with or in opposition to any business carried on by the Company or any of its affiliates; or

(c)     hold any ownership or debt interests of any kind in any ceding insurer client of the Company or its affiliates.

5.      **Place of Performance of Duties**

The Employee shall perform his duties hereunder in such offices of the Company and such other locations as his duties shall require or as the Board otherwise shall direct, including such business travel as may be required for such purposes.

6.      **Compensation and Expenses**

6.1     During the Employment Period, the Employee shall be paid by the Company a base salary at the gross annualized rate as specified in Schedule 1, which shall be payable in monthly installments in arrears in accordance with the Company's regular payroll policy, and shall be deemed to accrue pro-rata from day to day.

6.2     In addition, during the Employment Period, the Employee shall be eligible to receive certain incentive compensation pursuant to the terms of Schedule 1.

6.3     In addition, during the Employment Period, the Company shall reimburse the Employee for all reasonable and necessary out-of-pocket business expenses properly incurred by the Employee in the course of the Employee's employment for the benefit of the business of the Company, subject to Section 12 below and the Company's business expense

reimbursement policies, as in effect or amended from time to time.

7. **Employee Benefits**

During the Employment Period, the Employee shall be eligible to participate in such employee benefit plans (including with respect to vacation and sick leave), and to receive such other fringe benefits, as the Company may in its discretion make available to its similarly situated employees generally, subject to all present and future terms and conditions of such benefit plans and other fringe benefits (in each case as in effect, amended or terminated from time to time in the Company's discretion for similarly situated employees generally). The Company shall credit the Employee for the Employee's past service with CATCo Investment Management Ltd. for purposes of eligibility, vesting and benefit accruals under the Company's employee benefit plans, except to the extent such service credit would result in the duplication of benefits. Notwithstanding the foregoing, the Employee shall not be eligible at any time during the Employment Period to participate in or receive any benefits under any severance, separation, termination or similar plans, policies or programs (if any) of the Company or any of its affiliates.

8. **Confidentiality, Intellectual Property and Restrictive Covenants.**

8.1   The Employee hereby acknowledges that, by virtue of the Employee's unique relationship with the Company pursuant to this Agreement, the Employee will acquire and have access to Confidential Information (as defined below) and will also develop a unique and comprehensive familiarity with the Company and its Business (as defined below) and affiliates, which the Employee would not have otherwise had but for the Employee's employment with the Company, and which the Employee acknowledges are valuable assets of the Company and its affiliates. The Employee further acknowledges and agrees that the covenants in this Section 8 also are reasonably necessary and appropriate to protect the value of the goodwill and other assets acquired by the Company pursuant to the transactions contemplated by the Purchase Agreement. Accordingly, the Employee agrees to undertake the obligations in this Section 8, which the Employee acknowledges are reasonably designed to protect the legitimate business interests of the Company and its affiliates, without unreasonably restricting the Employee's post-employment opportunities.

8.2   The Employee acknowledges and agrees that all Confidential Information is, shall be and shall remain the property of the Company. The Employee agrees and covenants with the Company, as follows, subject in each case to Section 11 below:

(a)   Except as required by law or as authorized in advance by the Company in furtherance of the Employee's employment, the Employee shall not, at any time during or after the Employment Period, directly or indirectly use, disclose, reproduce, or take any action which may result in the use, disclosure or reproduction of, any Confidential Information for any purpose whatever, including without limitation for the Employee's own benefit, for that of any other party or in any way to the detriment of the Company or any of its affiliates.

5

(b)     The Employee shall at all times during the Employment Period use all reasonable efforts to prevent unauthorized publication, disclosure, use or reproduction of any Confidential Information.

(c)     The Employee shall not at any time during the Employment Period make, other than for the benefit of the Company, any lists, notes or memoranda relating to any matter within the scope of and directly or indirectly concerning the business, dealings or affairs of the Company or any of its affiliates.

(d)     "Confidential Information" as used in this Agreement means all confidential competitively sensitive and proprietary information or materials relating or belonging to the Company or any of its affiliates (in whatever form, whether or not reduced to writing, whether held in hard copy or any electronic medium, and whether or not acquired by the Company pursuant to the Purchase Agreement or otherwise acquired or developed), including without limitation all confidential or proprietary information furnished or disclosed to or otherwise obtained by the Employee in the course of the Employee's employment, and further includes without limitation:   computer programs; patented or unpatented inventions, discoveries and improvements; marketing, organizational, management, operating and business plans and strategies; research and development; policies and manuals; sales forecasts; information concerning actual or potential regulatory, legal, compliance, professional indemnity claims or investigations involving the Company or any of its affiliates; employee personnel file and medical file information; pricing and nonpublic financial information; current and prospective ceding insurer client, investor and agent lists and information on or belonging to ceding insurer clients, investors and agents or their employees; information concerning planned or pending acquisitions, investments or divestitures; and information concerning purchases of major equipment or property.  "Confidential Information" does not include information that lawfully is or becomes generally and publicly known outside of the Company and its affiliates other than through the Employee's breach of this Agreement or breach by another person or entity of some other obligation.

(e)     Nothing herein prohibits the Employee from disclosing Confidential Information as legally required pursuant to a validly issued subpoena or order of a court, Regulatory Organization or other governmental entity of competent jurisdiction, provided that the Employee shall first promptly notify the Company if the Employee receives a subpoena, court order or other order requiring any such disclosure, to allow the Company to seek protection therefrom in advance of any such legally compelled disclosure.

8.3     By the Employee's execution of this Agreement, the Employee hereby agrees to abide by the Intellectual Property Agreement attached as Schedule 2 hereto and hereby made a part of this Agreement.

8.4     Except as expressly authorized by the Company in furtherance of the Employee's employment duties, the Employee shall not, at any time during the Employee's

employment and for twenty-four (24) months after the termination thereof by either party for any or no reason, directly or indirectly (whether as a sole proprietor, owner (whether of equity, debt or other interests), employer, partner, investor, shareholder, member, employee, consultant or otherwise):

(a)    Engage in or assist any other person or entity in engaging in the business of insurance, reinsurance (including retrocession) or investment management relating to insurance or reinsurance (including retrocession) risk (the "Business"), perform services involving the Business in any executive, managerial, sales, marketing, research or other competitive capacity for any person or entity engaged in the Business, or provide material financial assistance involving the Business to any person or entity engaged in the Business, in each case anywhere in Bermuda, the United States of America or the United Kingdom (the "Territory"), it being understood and agreed that the Company actively conducts and will conduct the Business throughout the Territory and that the Business effectively may be engaged in from any location throughout the Territory; or

(b)    perform services or provide products relating to and competitive with the Business for or to, or accept or facilitate the acceptance of orders or instructions relating to and competitive with the Business from, any Ceding Insurer Client or Investor or Prospective Ceding Insurer Client or Investor (as defined below); or

(c)    solicit any Ceding Insurer Client or Investor or Prospective Ceding Insurer Client or Investor for the purpose of performing or providing or facilitating the performance or provision of any services or products, or accepting or facilitating the acceptance of orders or instructions, relating to and competitive with the Business; or

(d)    induce, solicit, or attempt to persuade any employee, consultant or other agent of the Company or any of its affiliates to terminate his, her or its employment, consultancy or other relationship or association with the Company or any such affiliate in order to enter into any employment or consulting relationship with or perform services for any other person or entity; or

(e)    induce, solicit, or attempt to persuade any supplier, vendor or other person or entity with which the Company or any of its affiliates has a business relationship to terminate, restrict or otherwise modify its business relationship with the Company or its affiliates.

8.5    Notwithstanding the foregoing, nothing in this Section 8 shall prohibit the Employee from owning not in excess of two percent (2%) in the aggregate of any class of capital stock or other ownership interests of any company if such stock or other ownership interests are publicly traded and listed on any national or regional stock exchange.

8.6    As used in this Section 8:

(a)    "Ceding Insurer Client or Investor" means any ceding insurer client of the Company or any of its affiliates, any investor in any collective investment scheme

7

then managed or operated by the Company or any of its affiliates, or any person or entity whose investment portfolio or assets are or were managed by the Company or any of its affiliates, in each case with respect to whom, at any time during the twenty-four (24) month period preceding the termination of the Employee's employment, the Employee:  (i) had material business dealings, or (ii) acquired or had access to Confidential Information, in each case in the course of his employment with the Company or any of its affiliates (or, prior to the Effective Date, in the course of his employment with CATCo Investment Management Ltd. or any of its affiliates).

(b)    "Prospective Ceding Insurer Client or Investor" means any person or entity other than a Ceding Insurer Client or Investor with respect to which, at any time during the twelve (12) month period preceding the termination of the Employee's employment, the Employee:  (i) submitted or assisted in the submission of a presentation or proposal of any kind in respect of the management of its insurance or reinsurance exposures or its investment portfolio or assets, as applicable, or (ii) had substantial contact or acquired or had access to Confidential Information, in each case as a result of or in connection with the Employee's employment with the Company or any of its affiliates (or, prior to the Effective Date, as a result of or in connection with the Employee's employment with CATCo Investment Management Ltd. or any of its affiliates).

8.7    Promptly upon termination of the Employee's employment by either party for any or no reason, or, if earlier, upon request of the Company, the Employee shall return to the Company any and all property of the Company, its affiliates, or the actual and prospective ceding insurer clients or investors of any of them, including without limitation any documents or things containing any Confidential Information, computer programs and drives or storage devices of any kind (portable or otherwise), minutes, memoranda, correspondence, files, forms, notes, records, charts, or any copies thereof (in whatsoever form held and whether or not held on computer storage media), further including without limitation any and all laptops and other computer equipment, blackberries and similar devices, cellphones, credit cards, keys and other access cards, and electronic and hardcopy files.

8.8    Following termination of the Employee's employment by either party for any or no reason, the Employee shall refrain from all conduct, verbal or otherwise, that disparages or damages the reputation, goodwill or standing in the community of the Company, any of its affiliates or their respective businesses or representatives.

8.9    The parties agree that in the event any of the prohibitions or restrictions set forth in this Section 8 (including without limitation in Schedule 2) are found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, it is the purpose and intent of the parties that any such prohibitions or restrictions be deemed modified or limited so that, as modified or limited, such prohibitions or restrictions may be enforced to the fullest extent possible.

8.10    The Employee acknowledges and agrees that a breach of any provision of this Section 8 (including without limitation any provision of Schedule 2) will result in immediate and irreparable harm to the Company and its affiliates for which full damages cannot readily be calculated and for which damages are an inadequate remedy.   Accordingly, the Employee agrees that the Company and its affiliates shall be entitled to injunctive relief to prevent any such actual or threatened breach or any continuing breach by the Employee (without posting a bond or other security), without limiting any other remedies that may be available to them.  The Employee further agrees to reimburse the Company and its affiliates for all costs and expenditures, including but not limited to reasonable attorneys' fees and court costs, incurred by any of them in connection with the successful enforcement of any of their rights under this Section 8 (including without limitation Schedule 2).

9.    **Termination**

9.1    Notwithstanding anything to the contrary in this Agreement, the Employee's employment and the Employment Period may be terminated at any time as provided in this Section 9:

(a)    The Employee's employment and the Employment Period may be terminated by the Company at any time for any or no reason, with or without Cause or advance notice and whether or not due to Incapacity (each as defined in Schedule 1).  Any such termination of employment shall be effective upon written notice of such termination to the Employee.

(b)    The Employee's employment and the Employment Period shall automatically terminate upon the Employee's death.

(c)    Subject to Section 2.2 above, the Employee's employment shall automatically terminate upon the expiration of the Employment Period.

9.2    Upon termination of the Employment Period by either party for any or no reason, the Employee shall be deemed automatically to have resigned as of such effective termination date from any and all officer and director positions (if any) that the Employee then holds with the Company or any of its affiliates.  The Board is irrevocably authorized to appoint another officer or director to act as the Employee's attorney in the Employee's name and on the Employee's behalf and to sign any documents or do any acts or things necessary or appropriate to effect such resignations.

10.    **Compensation Upon Termination**

10.1    In the event of any termination of the Employee's employment and the Employment Period by either party for any or no reason (whether or not due to Cause or Incapacity) or due to the Employee's death:  (a) the Employee shall receive any earned and unpaid base salary (and, if required by applicable law, earned and unused vacation pay) through the effective date of termination of the Employee's employment, payable by the next regularly scheduled payday after such effective termination date; (b) the Employee shall receive any unreimbursed expenses payable pursuant to this Agreement, provided that the Employee shall submit all requests to the Company for expense reimbursements within

thirty (30) calendar days after the effective date of termination of the Employee's employment; and (c) the Employee's participation in and rights under any applicable employee benefit plans will be governed by the terms and conditions of those plans (as in effect or amended from time to time) (collectively, the "Basic Separation Payments and Benefits").

10.2   The Employee's eligibility for certain Incentive Compensation (or a portion thereof), if any, in connection with a termination of Employee's employment is governed by and subject to the terms and conditions set forth in Schedule 1.

10.3   Except as expressly provided in this Agreement, the Employee shall not be entitled to, or receive, any severance pay or other amounts or benefits of any kind in the event of any termination by either party of the Employee's employment for any or no reason.  Without limiting the generality of the foregoing, any termination of the Employee's employment due to the expiration of the Employment Period shall not constitute or be considered a termination without Cause, and shall not entitle the Employee to any amounts or benefits other than the Basic Separation Payments and Benefits.

11.   **No Interference**

Notwithstanding any other provision of this Agreement, nothing in this Agreement shall prohibit the Employee from confidentially or otherwise (without informing the Company or its affiliates) communicating or filing a charge or complaint with a governmental entity, participating in a governmental investigation, or giving truthful testimony or disclosures to a governmental entity, or if properly subpoenaed or otherwise required to do so under applicable law.

12.   **Withholding; Compliance with Internal Revenue Code Section 409A.**

12.1   All amounts and benefits payable under this Agreement shall be reduced by any and all required or authorized withholding and deductions.

12.2   This Agreement shall be interpreted and construed in a manner that avoids the imposition of taxes and other penalties under Section 409A of the Internal Revenue Code of 1986, as amended (such code referred to as the "Code," and such taxes and other penalties referred to collectively as "409A Penalties"), to the extent applicable.  In the event that the terms of this Agreement would subject the Employee to 409A Penalties, the Company and the Employee shall cooperate diligently to amend the terms of this Agreement to avoid such 409A Penalties, to the extent possible.   All references in this Agreement to the Employee's termination of employment shall mean a separation from service within the meaning of Section 409A of the Code. Each payment under this Agreement as a result of the separation of the Employee's service shall be considered a separate payment for purposes of Section 409A of the Code. Any reimbursement (including any advancement) payable to the Employee pursuant to this Agreement shall be conditioned on the submission by the Employee of all expense reports reasonably required by the Company under any applicable expense reimbursement policy, and shall be paid to the Employee within thirty (30) calendar days following receipt of such expense reports, but in no event

later than the last day of the calendar year following the calendar year in which the Employee incurred the reimbursable expense.  Any amount of expenses eligible for reimbursement or in-kind benefit provided during a calendar year shall not affect the amount of expenses eligible for reimbursement or in-kind benefit to be provided during any other calendar year.  The right to reimbursement or to an in-kind benefit pursuant to this Agreement shall not be subject to liquidation or exchange for any other benefit. Notwithstanding any of the foregoing provisions of this Section 12, under no circumstances shall the Company be responsible for any taxes, penalties, interest or other losses or expenses incurred by the Employee due to any failure to comply with Section 409A of the Code.

13. **Notices**

13.1    Any notice, request or other communication required or permitted to be given hereunder shall be made to the following addresses or to any other address designated by either of the parties hereto by notice similarly given:   (a) if to the Company, to Markel Corporation, 4521 Highwoods Parkway, Glen Allen, VA 23060, United States of America, Attention: Richard R. Whitt III, email:  rwhitt@markelcorp.com, fax: (804) 527-3810, with a copy to Markel Corporation, 4521 Highwoods Parkway, Glen Allen, VA 23060, United States of America, Attention: Richard R. Grinnan, email: rgrinnan@MarkelCorp.com, fax: (804) 527-3810; and (b) if to the Employee, to the Employee's address listed on Schedule 1.   All such notices, requests or other communications shall be sufficient if made in writing either (i) by personal delivery to the party entitled thereto, (ii) by facsimile with confirmation of receipt or by email, (iii) by certified mail, return receipt requested, or (iv) by express courier service, and shall be effective upon personal delivery, upon confirmation of receipt of facsimile transmission, upon email transmission, upon the fourth calendar day after mailing by certified mail, or upon the second calendar day after sending by express courier service.

14. **Assignment; Third Party Beneficiaries**

14.1    This Agreement is enforceable by the Company and its affiliates and may be assigned or transferred by the Company to, and shall be binding upon and inure to the benefit of, any parent or other affiliate of the Company or any person or entity which at any time, whether by merger, purchase or otherwise, acquires all or substantially all of the assets, stock or business of the Company or of any discrete portion thereof.  The Employee may not assign or delegate any of the Employee rights or obligations under this Agreement. The parties agree that the affiliates of the Company are, and are expressly intended to be, third party beneficiaries of this Agreement having the full right to enforce the provisions of this Agreement applicable to or protective of affiliates, including without limitation Section 8 above.

15. **Amendment and Waiver**

15.1    This Agreement may not be amended orally and may only be amended by a written agreement signed by both parties (subject to Sections 8.9 and 19.1 herein).  A waiver by either party hereto of any of its rights or remedies under this Agreement on any occasion

11

shall not be a bar to the exercise of the same right or remedy on any subsequent occasion or of any other right or remedy at any time.

16.     **Governing Law; Jurisdiction; Venue**

16.1    This Agreement shall be governed by the internal laws of the state of New Hampshire, without regard to its conflict of laws rules.  The parties hereby irrevocably consent to, and agree not to object or assert any defense or challenge to, the jurisdiction and venue of the state and federal courts located in New Hampshire, and agree that any claim arising under or relating to this Agreement or the Employee's employment shall be brought exclusively in such a New Hampshire court.

17.     **Headings**

17.1    The Section headings used herein are for convenience of reference only and are not to be considered in construction of the provisions of this Agreement.

18.     **Entire Agreement; Survival; Payments to Beneficiaries**

18.1    This Agreement (including without limitation Schedules 1 and 2 hereto) contains the entire agreement between the parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous negotiations, understandings or agreements between the parties, whether written or oral, with respect to such subject matter; provided, however, that, subject to Section 11 above:  (a) nothing in this Agreement shall limit, supersede, waive or release the Employee from the Employee's Non-Competition, Non-Solicitation and Non-Disclosure Agreement with the Company dated as of the date hereof and executed by the Employee pursuant to and as a condition of the transactions contemplated by the Purchase Agreement (the "Seller Noncompetition Agreement"), or any fiduciary, statutory or other obligations the Employee has to the Company or any of its affiliates under applicable law, all of which shall continue in full force and effect and which the Employee shall comply with; and (b) the Company expressly reserves and retains, and is not limiting, superseding, waiving or releasing, any and all rights and claims that accrued under any agreement concerning confidentiality, intellectual or other property, or post-employment competitive or detrimental activities between the Employee and CATCo Investment Management Ltd. or any of its affiliates, the Employee hereby acknowledging and agreeing that any and all such rights and claims have been validly assigned to the Company pursuant to the Purchase Agreement.

18.2    Subject to Section 2.2 above, provisions of this Agreement (including the Schedules hereto) which by their terms or context apply or have continuing effect following the Employment Period shall survive and continue in full force and effect in accordance with their respective terms, notwithstanding any termination of the Employment Period or the Employee's employment by either party.  If the Employee dies before receiving any amounts to which the Employee is entitled under this Agreement, such amounts shall be paid in accordance with the terms of this Agreement to the beneficiary designated in writing by the Employee, or if none is so designated, to the Employee's estate.

is held to be prohibited by or invalid under applicable law (after any appropriate modification or limitation pursuant to Section 8.9), such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

## 20.   Counterparts

20.1   This Agreement may be executed in two counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

## 21.   Condition Precedent to Effectiveness

21.1   This Agreement and the Employee's employment hereunder will not be effective unless and until the Completion and the Effective Date occur pursuant to and in accordance with the Purchase Agreement. This Agreement shall be null and void and shall be of no force and effect in the event that the Purchase Agreement is terminated or the Completion and Effective Date otherwise do not occur for any or no reason.

**THE PARTIES ACKNOWLEDGE BY SIGNING BELOW THAT THEY HAVE READ AND UNDERSTAND THE ABOVE AND INTEND TO BE BOUND THEREBY:**

ANTHONY BELISLE

Date: 9 September 2015

[COMPANY] MARKEL CATCO INVESTMENT MANAGEMENT LTD.

By: _____

Position: _____

Date: _____

13

19. **Severability**

19.1 Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law (after any appropriate modification or limitation pursuant to Section 8.9), such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

20. **Counterparts**

20.1 This Agreement may be executed in two counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

21. **Condition Precedent to Effectiveness**

21.1 This Agreement and the Employee's employment hereunder will not be effective unless and until the Completion and the Effective Date occur pursuant to and in accordance with the Purchase Agreement. This Agreement shall be null and void and shall be of no force and effect in the event that the Purchase Agreement is terminated or the Completion and Effective Date otherwise do not occur for any or no reason.

**THE PARTIES ACKNOWLEDGE BY SIGNING BELOW THAT THEY HAVE READ AND UNDERSTAND THE ABOVE AND INTEND TO BE BOUND THEREBY:**

**ANTHONY BELISLE**

**MARKEL   CATCO   INVESTMENT MANAGEMENT LTD.**

By: _Nanny da Sil_

Date: _____

**Position:** _Director_

**Date:** _Sept 9, 2015_

13

## SCHEDULE 1

| | |
|---|---|
| **Employee Name and Address** | Anthony Belisle, P.O. Box 56, 308 Sewall Road, Wolfeboro, NH 03894. Tony.belisle@catcoim.com. |
| **Position** | Chief Executive Officer. |
| **Reports to** | The Board. |
| **Base salary (gross annualized rate)** | US $1,000,000 per year. |
| **Incentive Compensation** | In connection with the Employee's employment with the Company, he shall be eligible to receive incentive compensation comprised of a "Continued Service Element" and a "Performance Element" (collectively, "Incentive Compensation"), subject to the terms and conditions of the Agreement including this Schedule 1: |

Definitions

The following terms shall have the following definitions for purposes of this Schedule 1 and the remainder of the Agreement:

- "Cause" means any of the following conduct by the Employee, as determined in good faith by the Company:  (A) embezzlement, misappropriation of corporate funds, or other material acts of dishonesty; (B) conviction of any felony, or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or nolo contendere to any such felony or misdemeanor; (C) engagement in any activity that the Employee knows or reasonably should know will or could materially harm the business or reputation of the Company or any of its affiliates; (D) refusal to perform or disregard of the Employee's duties and responsibilities, or failure to adhere to the Company's or any of its affiliates' applicable corporate codes, policies or procedures, as in effect or amended from time to time; or (E) material breach of the Agreement (including without limitation Section 8) or other material obligation to the Company or any of its affiliates (including without limitation the Seller Noncompetition Agreement).  Notwithstanding the foregoing, the Company shall not terminate the Employee's employment pursuant to subparts (C), (D) or (E) above unless it first gives the Employee notice of and a reasonable opportunity to cure any such grounds for termination (provided that no such notice and cure opportunity shall be required as to any such grounds that are not reasonably susceptible to a cure under the circumstances).

- "Fee Income" means the aggregate management fee income, net of introducer fees, rebates and fee sharing arrangements, but before the deduction of the expenses incurred in operating the Company and any funds and insurance companies managed by the Company (collectively, the "Company Group") (including all salary costs and overheads), received by the Company Group over the entire Retention and

1

Performance Period, provided that for purposes of determining Fee Income hereunder, the Company shall disregard any fee income attributable to the business operations of any entity acquired by the Company during the Retention and Performance Period or to any other unusual or nonrecurring events occurring during such period. The Company's good faith determination of Fee Income shall be final and binding for purposes of determining the Employee's eligibility for, and the amount of, any Performance Element.

- "Incapacity" means such physical or mental condition of the Employee which renders or is expected to render the Employee incapable of performing the essential functions of the Employee's position hereunder with (to the extent required by law) or without reasonable accommodation for ninety (90) consecutive calendar days, or for one hundred twenty (120) calendar days (whether consecutive or not) within any one hundred eighty (180)-calendar-day period (in each case, except as otherwise provided by law), as determined in good faith by the Company upon consultation with a physician selected by the Company in its discretion. The Employee hereby agrees to submit to any reasonable medical examination(s) as may be recommended by the Company for the purpose of determining the existence or absence of Incapacity.

- "Retention and Performance Period" means the period that commences on January 1, 2016 and ends on (and including) December 31, 2018.

Continued Service Element

The Employee shall be eligible to receive a total gross aggregate Continued Service Element of the Incentive Compensation equal to US $37,500,000. The Employee shall earn one-third (1/3) of such total gross aggregate Continued Service Element (i.e., US $12,500,000) as of each of the following dates (each such date, a "vesting date," and each such payment, a "Retention Payment"):

- December 31, 2016;

- December 31, 2017; and

- December 31, 2018;

provided in each case that the Employee complies with this Agreement and the Seller Noncompetition Agreement and remains actively and continuously employed in good standing with the Company as of each such applicable vesting date (and subject to the remaining provisions below). Any such earned Retention Payment shall be paid within thirty (30) calendar days after the applicable vesting date upon which it becomes earned.

Performance Element

The Employee shall be eligible to receive a total gross aggregate target Performance Element of the Incentive Compensation based on Fee Income

2

received during the Retention and Performance Period, provided that the Employee complies with this Agreement and the Seller Noncompetition Agreement and remains actively and continuously employed in good standing with the Company throughout the Retention and Performance Period (and subject to the remaining provisions below).

The Performance Element for which the Employee is eligible shall be calculated as follows:

(i) $37,500,000 <u>multiplied by</u> (ii) the quotient of Fee Income <u>divided by</u> $81,000,000.

(i.e., $37,500,000 x (Fee Income⁄$81,000,000))

Any Performance Element of the Incentive Compensation that becomes earned and payable hereunder shall be paid within thirty (30) calendar days after the last day of the Retention and Performance Period.

<u>Termination Provisions</u>

Notwithstanding the foregoing:

(a) in the event the Company terminates the Employee's employment without Cause (and not due to Incapacity) with an effective termination date occurring prior to the last day of the Retention and Performance Period:

(i) the Employee shall be deemed to have earned any and all then-unearned and unpaid Retention Payments as of such effective employment termination date, which shall then be paid to the Employee within thirty (30) calendar days after such effective employment termination date; and

(ii) the Employee shall remain eligible to receive the Performance Element (to be calculated and determined as provided above) as if the Employee's employment had continued in good standing through the end of the Retention and Performance Period (provided, however, that the Employee continues to comply with this Agreement and the Seller Noncompetition Agreement). Any Performance Element of the Incentive Compensation that becomes earned and payable hereunder shall be paid within thirty (30) calendar days after the last day of the Retention and Performance Period.

(b) in the event the Employee's employment terminates due to his Incapacity or death with an effective termination date occurring prior to the last day of the Retention and Performance Period:

(i) the Employee shall be deemed to have earned a pro-rated portion of the Continued Service Element of the Incentive Compensation calculated as (x) US $37,500,000 <u>multiplied by</u> (y) a fraction, the

3

numerator of which is the number of completed calendar months during which the Employee was actively and continuously employed during the Retention and Performance Period and the denominator of which is thirty-six (36), <u>reduced by</u> (z) any and all Retention Payments then already paid to the Employee.  Any such pro-rated portion of the Continued Service Element shall be paid to the Employee within thirty (30) calendar days after such effective employment termination date; and

(ii)  the Employee shall not be entitled to, or receive, any Performance Element of the Incentive Compensation (or any portion thereof).

(c)  in the event the Company terminates the Employee's employment for Cause, or the Employee resigns for any or no reason, in each case with an effective employment termination date prior to the last day of the Retention and Performance Period, or in the event the Employee at any time breaches any of the Employee's continuing post-employment obligations under the Agreement or the Seller Noncompetition Agreement, the Employee shall not be entitled to, or receive, any then-unearned or unpaid Retention Payments or any Performance Element of the Incentive Compensation (or any portion thereof).

## SCHEDULE 2

## INTELLECTUAL PROPERTY AGREEMENT

As a material part of the consideration for my employment by Markel CATCo Investment Management Ltd. ("Company") and the salary and other compensation that I, Anthony Belisle, shall receive during my employment, I acknowledge and agree that, by my signature on the Employment Agreement ("Employment Agreement") to which this Intellectual Property Agreement ("Agreement") is attached as Schedule 2, I also agree to this Agreement's terms, which are deemed incorporated into and a part of the Employment Agreement:

1. (a)  Company owns the sole and exclusive right, title and interest in and to any and all Works (as defined below), including without limitation any and all source code or other intellectual property and further including without limitation all copyrights, trademarks, service marks, trade names, slogans, patents, ideas, designs, concepts and other proprietary rights.  Company's right, title and interest in and to the Works includes without limitation the sole and exclusive right to secure and own copyrights and maintain renewals throughout the world, and the right to modify and create derivative works of or from the Works without any payment of any kind to me.  I agree that the Works shall be "work made for hire" as that term is defined in the copyright laws of the United States, and not works of joint ownership. To the extent that any of the Works is determined not to constitute work made for hire, or if any rights in any of the Works do not accrue to Company as a work made for hire, my signature on the Employment Agreement constitutes an assignment (without any further consideration) to Company of any and all of my respective copyrights and other rights, title and interest in and to all Works.  I will disclose promptly to Company all Works, whether or not they are patentable, copyrightable or subject to trade secret protection.

(b)  I will provide any assistance reasonably requested by Company to obtain United States and non-United States letters patent and copyright registrations covering inventions, original works of authorship and other Works belonging or assigned hereunder to Company.  I will execute any transfers of ownership of letters patent or assignments of copyrights or other proprietary rights transferred or assigned hereunder (including without limitation short form assignments intended for recording with the U.S. Copyright Office, the U.S. Patent and Trademark Office, or any other person or entity).  I understand that my obligations under this Section 1(b) shall survive any termination of this Agreement or of my employment by Company in perpetuity, provided that Company will compensate me at a reasonable rate for time actually spent performing such obligations at Company's request after any such termination.  If Company is unable for any reason whatsoever, including my mental or physical incapacity, to secure my signature to apply for or to pursue any application for any United States or non-United States letters patent or copyright registrations or on any document transferring or assigning any patent, copyright or other proprietary right that I am obligated hereunder to transfer or assign, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and on my behalf and in my stead to execute and file any such applications and documents and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations or transfers or assignments thereof or of any other proprietary rights with the same legal force and effect as if executed by me.  This appointment is coupled with an interest in and to the inventions, works of authorship, trade secrets and other Works to which any proprietary rights may apply and shall survive my death or disability.

(c)  As used in this Agreement, "Works" means (i) any inventions, developments, improvements, trade secrets, ideas or original works of authorship that I conceive, create, develop, discover, make, acquire or reduce to practice in whole or in part, either solely or jointly with another or others, during or pursuant to the course of my employment by Company and that relate to Company or any of its affiliates or their respective businesses, or to Company's or any of its affiliates' actual or demonstrably anticipated research or development, (ii) any inventions, developments, improvements, trade secrets, ideas or original works of authorship that I conceive, create, develop, discover, make, acquire or reduce to practice in whole or in part, either solely or jointly with another or others, during or pursuant to the course of my employment by Company and that are made through the use of any of Company's or any of its affiliates' equipment, facilities, supplies, trade secrets or time, or that result from any work performed for Company or any of its affiliates, and (iii) any part or aspect of any of the foregoing.

2.  I have been notified by Company, and understand, that the foregoing provisions of Section 1 do not apply to an invention for which no equipment, supplies, facilities or trade secret information of Company or any of its affiliates was used and which was developed entirely on my own time, unless:  (a) the invention relates (i) to the business of Company or any of its affiliates or (ii) to Company's or any of its affiliates' actual or demonstrably anticipated research and development, or (b) the invention results from any work performed by me for Company or any of its affiliates.  I have listed and described on an attached page all inventions of my own to which I claim Section 1 does not apply.  If no such page is attached and signed by me and an authorized Company representative, no such inventions exist.