UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY BELISLE,

                              :

                  Plaintiff,        Civil Action

                              :   No. 19-00189-LM

      v.

                              :   **ANSWER AND**

MARKEL CATCO INVESTMENT           **COUNTERCLAIMS AND**

MANAGEMENT LTD AND MARKEL    :   **DEMAND FOR JURY TRIAL**

CORP.,

                              :

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Defendants Markel CATCo Investment Management Ltd. ("MCIM" or the "Company")

and Markel Corporation ("Markel," and with MCIM, the "Companies"), by their undersigned

counsel, answer plaintiff Anthony Belisle's ("Belisle" or "Plaintiff") First Amended Complaint

and Jury Demand as follows:

**<u>ANSWER</u>**

        Defendants aver that the unnumbered paragraph on page 1 of the First Amended

Complaint and Jury Demand contains no factual allegations and thus no answer to it is required.

To the extent the unnumbered paragraph on page 1 of the First Amended Complaint and Jury

Demand is deemed to contain factual allegations, they are denied.

        1.      The bold heading immediately preceding paragraph 1 of the First Amended

Complaint and Jury Demand contains no factual allegations and thus no answer to it is required.

To the extent the bold heading immediately preceding paragraph 1 of the First Amended

Complaint and Jury Demand is deemed to contain factual allegations, they are denied.

Defendants deny the allegations in paragraph 1 of the First Amended Complaint and Jury

Demand.

2.      Defendants deny the allegations in paragraph 2 of the First Amended Complaint and Jury Demand.

3.      Defendants admit that Markel agreed to purchase substantially all of the assets of CATCo Investment Management Ltd. and CATCo-Re Ltd. on or about September 9, 2015, and Defendant MCIM admits that it entered into the "Employment Agreement" with Plaintiff in conjunction with the sale.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of paragraph 3 of the First Amended Complaint and Jury Demand, and deny the remaining factual allegations in paragraph 3 of the First Amended Complaint and Jury Demand.  Answering further, Defendants refer to the document titled "Employment Agreement" in the fourth sentence of paragraph 3 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

4.      Defendants deny the allegations in paragraph 4 of the First Amended Complaint and Jury Demand.

5.      Defendants admit only the allegations in the first and second sentences of paragraph 5 of the First Amended Complaint and Jury Demand that Plaintiff and Alissa Fredricks were terminated for Cause on January 18, 2019, but deny the remaining factual allegations in paragraph 5 of the First Amended Complaint and Jury Demand.

6.      Defendants deny the allegations in paragraph 6 of the First Amended Complaint and Jury Demand.

7.      Defendants deny the allegations in paragraph 7 of the First Amended Complaint and Jury Demand, and answering further, refer to the document "Markel CATCo's bye-laws" referenced in the second sentence of paragraph 7 for a full and accurate statement of its contents.

8.      Defendants deny the allegations in paragraph 8 of the First Amended Complaint and Jury Demand.

9.      Defendants deny the allegations in paragraph 9 of the First Amended Complaint and Jury Demand.

10.     Defendants aver that allegations contained in paragraph 10 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 10 of the First Amended Complaint and Jury Demand.

11.     The bold heading immediately preceding paragraph 11 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the bold heading immediately preceding paragraph 11 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11 of the First Amended Complaint and Jury Demand, and answering further, refer to the "Employment Agreement" referenced in paragraph 11 for a full and accurate statement of its contents.

12.     Defendants admit the allegations in paragraph 12 of the First Amended Complaint and Jury Demand.

13.     Defendants admit the allegations in the first, second and third sentences of paragraph 13 of the First Amended Complaint and Jury Demand, but deny the allegations in the fourth, fifth and sixth sentences of paragraph 13 of the First Amended Complaint and Jury Demand.

14.     The bold heading immediately preceding paragraph 14 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the heading immediately preceding paragraph 14 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied.  Defendants aver that allegations contained in paragraph 14 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required.  To the extent that a response is deemed required, Defendants admit the allegations contained in paragraph 14 of the First Amended Complaint and Jury Demand.

15.     Defendants aver that allegations contained in paragraph 15 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that this Court has personal jurisdiction over MCIM.

16.     Defendants aver that allegations contained in paragraph 16 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that this Court has personal jurisdiction over Markel.

17.     Defendants aver that allegations contained in paragraph 17 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that venue is proper in this district, but deny that a substantial part of the events giving rise to Plaintiff's claim occurred in this district, and answering further, refer to the "Employment Agreement" referenced in paragraph 17 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

18.     The bold headings immediately preceding paragraph 18 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to it is required. To the extent that the bold headings immediately preceding paragraph 18 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied. Defendants admit that Markel agreed to purchase substantially all of the assets of CATCo Investment Management Ltd. and CATCo-Re Ltd. in 2015, but lack knowledge or information sufficient to form a belief about the truth of the remaining factual allegations in paragraph 18 of the First Amended Complaint and Jury Demand.

19.     Defendants deny the allegations in the first sentence of paragraph 19 of the First Amended Complaint and Jury Demand, but admit the allegations in the second and third sentences of paragraph 19 of the First Amended Complaint and Jury Demand.

20.     Defendants deny the allegations in paragraph  20 of the First Amended Complaint and Jury Demand, and answering further, refer to the "press release" referenced in the second sentence of paragraph 20 of the First Amended Complaint and Jury Demand and the document titled "Employment Agreement" in the third sentence of paragraph 20 of the First Amended Complaint and Jury Demand for a full and accurate statement of their contents, respectively.

21.     Defendants admit that MCIM committed to establishing a pool, subject to certain conditions being satisfied, of $50,000,000 for the Performance Element of the Incentive Compensation in connection with the sale to Markel, of which $37,500,000 was allocated, subject to certain conditions being satisfied, to Plaintiff, the terms of which are set forth on Schedule 1, of the Employment Agreement.  Answering further, Defendants refer to the "Employment Agreement" referenced in paragraph 21 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents, and deny any remaining factual

allegations in paragraph 21 of the First Amended Complaint and Jury Demand inconsistent with the Employment Agreement.

22.     Defendants admit that MCIM committed to establishing a pool, subject to certain conditions being satisfied, of $50,000,000 for the Performance Element of the Incentive Compensation in connection with the sale to Markel, of which $37,500,000 was allocated, subject to certain conditions being satisfied, to Plaintiff, the terms of which are set forth on Schedule 1, of the Employment Agreement and Defendants further admit the allegations in seventh sentence in paragraph 22 of the First Amended Complaint and Jury Demand.  Answering further, Defendants refer to the "Employment Agreement" referenced in paragraph 22 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents, and deny any remaining factual allegations in paragraph 22 of the First Amended Complaint and Jury Demand inconsistent with the Employment Agreement.

23.     Defendants deny the allegations in paragraph 23 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Employment Agreement" in the first sentence of paragraph 23 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

24.     Defendants deny the allegations in paragraph 24 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Employment Agreement" in the first and second sentences of paragraph 24 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

25.     Defendants deny the allegations in paragraph 25 of the First Amended Complaint and Jury Demand.

26.     Defendants deny the allegations in paragraph 26 of the First Amended Complaint and Jury Demand.

27.     The bold heading immediately preceding paragraph 27 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the heading immediately preceding paragraph 27 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied.  Defendants admit the allegations in paragraph 27 of the First Amended Complaint and Jury Demand.

28.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of paragraph 28 of the First Amended Complaint and Jury Demand, and admit the allegations in the third sentence of paragraph 28 of the First Amended Complaint and Jury Demand.

29.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the First Amended Complaint and Jury Demand.

30.     Defendants admit the allegations in paragraph 30 of the First Amended Complaint and Jury Demand.

31.     Defendants deny the allegations in paragraph 31 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Fredricks Addendum" in the first sentence of paragraph 31 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

32.     Defendants deny the allegations in paragraph 32 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Fredricks Addendum" in the first sentence of paragraph 32 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

33.     Defendants deny the allegations in paragraph 33 of the First Amended Complaint and Jury Demand.

34.     The bold heading immediately preceding paragraph 34 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent that the bold heading immediately preceding paragraph 34 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied. Defendants admit the allegations in the first, second and third sentences of paragraph 34 of the First Amended Complaint and Jury Demand, but deny the allegations in the fourth and fifth sentences of paragraph 34 of the First Amended Complaint and Jury Demand.

35.     Defendants admit that on November 30, 2018, Markel was contacted by U.S. authorities with inquiries regarding loss reserves recorded in late 2017 and early 2018 at MCIM, and Defendants further admit the second, fourth and sixth sentences in paragraph 35 of the First Amended Complaint and Jury demand, but deny the remaining factual allegations in paragraph 35 of the First Amended Complaint and Jury Demand.

36.     Defendants admit the allegations in paragraph 36 of the First Amended Complaint and Jury Demand.

37.     Defendants deny the allegations in paragraph 37 of the First Amended Complaint and Jury Demand.

38.     Defendants deny the allegations in paragraph 38 of the First Amended Complaint and Jury Demand.

39.     Defendants admit that Markel issued a press release on December 6, 2018, disclosing the existence of the Government Inquiry, and that the Government Inquiry did not "involve other Markel Corporation companies" and that "outside counsel has been retained to

conduct an internal review," but deny the remaining factual allegations in paragraph 39 of the First Amended Complaint and Jury Demand.

40.     Defendants admit the allegations in paragraph 40 of the First Amended Complaint and Jury Demand.

41.     Defendants deny the allegations in paragraph 41 of the First Amended Complaint and Jury Demand.

42.     Defendants deny the allegations in paragraph 42 of the First Amended Complaint and Jury Demand.

43.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first, third and fourth sentences of paragraph 43 of the First Amended Complaint and Jury Demand, admit the allegations in the second sentence of paragraph 43 of the First Amended Complaint and Jury Demand and deny the allegations in the fifth sentence of paragraph 43 of the First Amended Complaint and Jury Demand.

44.     Defendants deny the allegations in the bold heading immediately preceding paragraph 44 of the First Amended Complaint and Jury Demand.   Defendants admit the allegations in paragraph 44 of the First Amended Complaint and Jury Demand.

45.     Defendants deny the allegations in paragraph 45 of the First Amended Complaint and Jury Demand.

46.     Defendants deny the allegations in first sentence of paragraph 46 of the First Amended Complaint and Jury Demand, but admit the allegations in the second sentence of paragraph 46.   Answering further, Defendants refer to the "proposed amendment to the Employment Agreement" referenced in the first sentence of paragraph 46 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

47.     Defendants deny the allegations in paragraph 47 of the First Amended Complaint and Jury Demand.

48.     Defendants deny the allegations in paragraph 48 of the First Amended Complaint and Jury Demand.

49.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 49 of the First Amended Complaint and Jury Demand, but deny the allegations in the second sentence of paragraph 49 of the First Amended Complaint and Jury Demand.

50.     Defendants deny the allegations in paragraph 50 of the First Amended Complaint and Jury Demand.

51.     Defendants deny the allegations in paragraph 51 of the First Amended Complaint and Jury Demand.

52.     Defendants deny the allegations in paragraph 52 of the First Amended Complaint and Jury Demand.

53.     Defendants admit that Richard Whitt had lunch with Robert Vrolyk on January 11, 2019, but deny the remaining factual allegations in paragraph 53 of the First Amended Complaint and Jury Demand.

54.     Defendants deny the allegations in paragraph 54 of the First Amended Complaint and Jury Demand.

55.     Defendants deny the allegations in paragraph 55 of the First Amended Complaint and Jury Demand.

56.     Defendants deny the allegations in the bold heading immediately preceding paragraph 56 of the First Amended Complaint and Jury Demand.   Defendants admit the

allegations in first sentence of paragraph 56 of the First Amended Complaint and Jury Demand, but deny the allegations in the second sentence of paragraph 56 of the First Amended Complaint and Jury Demand.

57.     Defendants admit the allegations in first sentence of paragraph 57 of the First Amended Complaint and Jury Demand, but deny the allegations in the second sentence of paragraph 57 of the First Amended Complaint and Jury Demand.

58.     Defendants deny the allegations in paragraph 58 of the First Amended Complaint and Jury Demand.

59.     Defendants deny the allegations in paragraph 59 of the First Amended Complaint and Jury Demand.

60.     The bold heading immediately preceding paragraph 60 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the heading immediately preceding paragraph 60 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied.  Defendants deny the allegations in paragraph 60 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled the "Pre-2019 Code of Conduct" in the first sentence of paragraph 60 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

61.     Defendants admit that they became aware that Plaintiff and Ms. Fredricks had developed a personal relationship, but deny the remaining factual allegations in paragraph 61 of the First Amended Complaint and Jury Demand. Answering further, Defendants refer to the document titled "Substitute Code of Conduct" in the fourth sentence of paragraph 61 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

62.     Defendants deny the allegations in paragraph 62 of the First Amended Complaint and Jury Demand.

63.     Defendants admit that at the time of her promotion to CEO Bermuda, Ms. Fredricks' salary was increased from $228,500 to $400,000, which increase was approved by Mr. Whitt and HR at Markel, but deny the remaining factual allegations in paragraph 63 of the First Amended Complaint and Jury Demand.

64.     The bold heading immediately preceding paragraph 64 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the heading immediately preceding paragraph 64 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied.  Defendants deny the allegations in paragraph 64 of the First Amended Complaint and Jury Demand.

65.     Defendants deny the allegations in paragraph 65 of the First Amended Complaint and Jury Demand.

66.     Defendants deny the allegations in paragraph 66 of the First Amended Complaint and Jury Demand.

67.     Defendants admit the allegations in the first sentence of paragraph 67 of the First Amended Complaint and Jury Demand, but deny the allegations in the second and third sentences of paragraph 67 of the First Amended Complaint and Jury Demand.  Answering further, Defendants refer to the document titled "Notice of Termination of Employment" in the first sentence of paragraph 67 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

68.     Defendants deny the allegations in paragraph 68 of the First Amended Complaint and Jury Demand.

69.     Defendants deny the allegations in paragraph 69 of the First Amended Complaint and Jury Demand.

70.     Defendants admit that on January 28, 2019, MCIM convened a call, led by Jed Rhoads, President and Chief Underwriting Officer, Markel Global Reinsurance, but deny the remaining factual allegations in paragraph 70 of the First Amended Complaint and Jury Demand.

71.     Defendants deny the allegations in paragraph 71 of the First Amended Complaint and Jury Demand.

72.     Defendants deny the allegations in paragraph 72 of the First Amended Complaint and Jury Demand.

73.     Defendants deny the allegations in paragraph 73 of the First Amended Complaint and Jury Demand, and answering further, refer to the document "Grinnan's letter" referenced in the second sentence of paragraph 73 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

74.     Defendants admit the allegations in paragraph 74 of the First Amended Complaint and Jury Demand and answering further, refer to the "agreement" referenced in the second sentence of paragraph 74 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

75.     The bold heading immediately preceding paragraph 75 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the heading immediately preceding paragraph 75 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied.  Defendants deny the allegations in the first sentence of paragraph 75 of the First Amended Complaint and Jury Demand, lack knowledge or information sufficient to form a belief about the truth of the

allegations in the second sentence of paragraph 75 of the First Amended Complaint and Jury Demand and admit the allegations in the third sentence of paragraph 75 of the First Amended Complaint and Jury Demand.

76.     Defendants aver that allegations contained in the first sentence of paragraph 76 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that Plaintiff's conduct is involved in the Government Inquiry and thousands of pages of documents related to Plaintiff have been produced in response to the Government Inquiry, but deny the remaining factual allegations contained in paragraph 76 of the First Amended Complaint and Jury Demand.

77.     Defendants deny the allegations in first sentence of paragraph 77 of the First Amended Complaint and Jury Demand, but lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of paragraph 77 of the First Amended Complaint and Jury Demand. Answering further, Defendants refer to the document titled "Bye-Laws" in the first sentence of paragraph 77 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

78.     Defendants admit the allegations in paragraph 78 of the First Amended Complaint and Jury Demand, and further state that MCIM has no obligation to indemnify Plaintiff.

79.     Defendants deny the allegations in paragraph 79 of the First Amended Complaint and Jury Demand.

80.     Defendants deny the allegations in paragraph 80 of the First Amended Complaint and Jury Demand.

81.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of paragraph 81 of the First Amended Complaint and Jury Demand, but deny the allegations in the second sentence of paragraph 81 of the First Amended Complaint and Jury Demand.

82.     Defendants deny the allegations in paragraph 82 of the First Amended Complaint and Jury Demand.

83.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first sentence of paragraph 83 of the First Amended Complaint and Jury Demand, but deny the allegations in the second and third sentences of paragraph 83 of the First Amended Complaint and Jury Demand.

84.     The bold headings immediately preceding paragraph 84 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 84 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants incorporate by reference their responses to paragraphs 1 through 83 of the First Amended Complaint and Jury Demand as if set forth fully herein.

85.     Defendants deny the allegations in paragraph 85 of the First Amended Complaint and Jury Demand.

86.     Defendants admit the allegations in paragraph 86 of the First Amended Complaint and Jury Demand and, answering further, refer to the document titled "Employment Agreement" in paragraph 86 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

87.     Defendants deny the allegations in paragraph 87 of the First Amended Complaint and Jury Demand.

88.     Defendants deny the allegations in paragraph 88 of the First Amended Complaint and Jury Demand.

89.     Defendants deny the allegations in paragraph 89 of the First Amended Complaint and Jury Demand.

90.     Defendants deny the allegations in paragraph 90 of the First Amended Complaint and Jury Demand.

91.     Defendants admit the allegations in paragraph 91 of the First Amended Complaint and Jury Demand and, answering further, refer to the documents titled "Employment Agreement" in the first and second sentences of paragraph 91 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

92.     Defendants deny the allegations in paragraph 92 of the First Amended Complaint and Jury Demand.

93.     Defendants deny the allegations in paragraph 93 of the First Amended Complaint and Jury Demand.

94.     Defendants aver that allegations contained in paragraph 94 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 94 of the First Amended Complaint and Jury Demand.

95.     Defendants deny the allegations in paragraph 95 of the First Amended Complaint and Jury Demand.

96.     Defendants deny the allegations in paragraph 96 of the First Amended Complaint and Jury Demand.

97.     Defendants deny the allegations in paragraph 97 of the First Amended Complaint and Jury Demand.

98.     Defendants deny the allegations in paragraph 98 of the First Amended Complaint and Jury Demand.

99.     The bold headings immediately preceding paragraph 99 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 99 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants incorporate by reference their responses to paragraphs 1 through 98 of the First Amended Complaint and Jury Demand as if set forth fully herein.

100.    Defendants aver that allegations contained in paragraph 100 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 100 of the First Amended Complaint and Jury Demand.

101.    Defendants aver that allegations contained in paragraph 101 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 101 of the First Amended Complaint and Jury Demand.

102.    Defendants aver that allegations contained in paragraph 102 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required.

To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 102 of the First Amended Complaint and Jury Demand.

103.    Defendants deny the allegations in paragraph 103 of the First Amended Complaint and Jury Demand.

104.    Defendants deny the allegations in paragraph 104 of the First Amended Complaint and Jury Demand and, answering further, refer to the documents titled "Pre-2019 Code of Conduct" and "Substitute Code of Conduct" in paragraph 104 of the First Amended Complaint and Jury Demand for a full and accurate statement of their contents, respectively.

105.    Defendants deny the allegations in paragraph 105 of the First Amended Complaint and Jury Demand.

106.    Defendants deny the allegations in paragraph 106 of the First Amended Complaint and Jury Demand.

107.    Defendants aver that allegations contained in paragraph 107 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 107 of the First Amended Complaint and Jury Demand.

108.    Defendants deny the allegations in paragraph 108 of the First Amended Complaint and Jury Demand.

109.    The bold headings immediately preceding paragraph 109 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 109 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants

incorporate by reference their responses to paragraphs 1 through 108 of the First Amended Complaint and Jury Demand as if set forth fully herein.

110.   Defendants deny the allegations in paragraph 110 of the First Amended Complaint and Jury Demand.

111.   Defendants deny the allegations in paragraph 111 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Employment Agreement" in paragraph 111 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

112.   Defendants admit the allegations in the first sentence of paragraph 112 of the First Amended Complaint and Jury Demand, but deny the allegations in the second sentence of paragraph 112 of the First Amended Complaint and Jury Demand.

113.   Defendants deny the allegations in paragraph 113 of the First Amended Complaint and Jury Demand.

114.   Defendants deny the allegations in paragraph 114 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled "Employment Agreement" in paragraph 114 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

115-121.   No answer is required as partial motion to dismiss is being filed with respect to Count IV, paragraphs 115 through 121, of the First Amended Complaint and Jury Demand.  To the extent a response is required, the allegations in these paragraphs are denied.

122.   The bold headings immediately preceding paragraph 122 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 122 of the First Amended Complaint

and Jury Demand are deemed to contain factual allegations, they are denied. Defendants incorporate by reference their responses to paragraphs 1 through 121 of the First Amended Complaint and Jury Demand as if set forth fully herein.

123. Defendants aver that allegations contained in paragraph 123 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 123 of the First Amended Complaint and Jury Demand.

124. Defendants deny the allegations in paragraph 124 of the First Amended Complaint and Jury Demand, and answering further, refer to the "press release" referenced in the first and second sentences of paragraph 124 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

125. Defendants admit the allegations in paragraph 125 of the First Amended Complaint and Jury Demand.

126. Defendants admit that Plaintiff and Ms. Fredricks were terminated because they breached their respective employment agreements, engaged in actions that subjected them to a conflict of interest, and violated the code of conduct and, answering further, refer to the "investor call" on January 28, 2019, referenced in the second sentence of paragraph 126 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 126 of the First Amended Complaint and Jury Demand.

127. Defendants deny the allegations in paragraph 127 of the First Amended Complaint and Jury Demand.

128.     Defendants deny the allegations in paragraph 128 of the First Amended Complaint and Jury Demand and all of its subparts.

129.     Defendants deny the allegations in paragraph 129 of the First Amended Complaint and Jury Demand.

130.     Defendants deny the allegations in paragraph 130 of the First Amended Complaint and Jury Demand.

131.     Defendants deny the allegations in paragraph 131 of the First Amended Complaint and Jury Demand.

132.     Defendants deny the allegations in paragraph 132 of the First Amended Complaint and Jury Demand.

133.     Defendants aver that allegations contained in paragraph 133 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 133 of the First Amended Complaint and Jury Demand.

134.     Defendants deny the allegations in paragraph 134 of the First Amended Complaint and Jury Demand.

135.     Defendants deny the allegations in paragraph 135 of the First Amended Complaint and Jury Demand.

136.     The bold headings immediately preceding paragraph 136 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 136 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants

incorporate by reference their responses to paragraphs 1 through 135 of the First Amended Complaint and Jury Demand as if set forth fully herein.

137.    The bold heading immediately preceding paragraph 137 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the bold heading immediately preceding paragraph 137 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied. Defendants deny the allegations in paragraph 137 of the First Amended Complaint and Jury Demand.

138.    Defendants deny the allegations in paragraph 138 of the First Amended Complaint and Jury Demand.

139.    Defendants deny the allegations in paragraph 139 of the First Amended Complaint and Jury Demand.

140.    Defendants deny the allegations in paragraph 140 of the First Amended Complaint and Jury Demand.

141.    Defendants deny the allegations in paragraph 141 of the First Amended Complaint and Jury Demand.

142.    Defendants deny the allegations in paragraph 142 of the First Amended Complaint and Jury Demand.

143.    Defendants deny the allegations in paragraph 143 of the First Amended Complaint and Jury Demand.

144.    The bold heading immediately preceding paragraph 144 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the bold heading immediately preceding paragraph 144 of the First Amended

Complaint and Jury Demand is deemed to contain factual allegations, they are denied. Defendants deny the allegations in paragraph 144 of the First Amended Complaint and Jury Demand.

145.    Defendants deny the allegations in paragraph 145 of the First Amended Complaint and Jury Demand.

146.    Defendants deny the allegations in paragraph 146 of the First Amended Complaint and Jury Demand.

147.    Defendants deny the allegations in paragraph 147 of the First Amended Complaint and Jury Demand.

148.    Defendants deny the allegations in paragraph 148 of the First Amended Complaint and Jury Demand.

149.    The bold heading immediately preceding paragraph 149 of the First Amended Complaint and Jury Demand contains no factual allegations and thus no answer to it is required. To the extent the bold heading immediately preceding paragraph 149 of the First Amended Complaint and Jury Demand is deemed to contain factual allegations, they are denied. Defendants deny the allegations in paragraph 149 of the First Amended Complaint and Jury Demand.

150.    Defendants deny the allegations in paragraph 150 of the First Amended Complaint and Jury Demand.

151.    Defendants deny the allegations in paragraph 151 of the First Amended Complaint and Jury Demand.

152.    Defendants deny the allegations in paragraph 152 of the First Amended Complaint and Jury Demand.

153.     Defendants deny the allegations in paragraph 153 of the First Amended Complaint and Jury Demand.

154.     The bold headings immediately preceding paragraph 154 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 154 of the First Amended Complaint and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants incorporate by reference their responses to paragraphs 1 through 153 of the First Amended Complaint and Jury Demand as if set forth fully herein.

155.     Defendants deny the allegations in paragraph 155 of the First Amended Complaint and Jury Demand.

156.     Defendants admit the allegations in paragraph 156 of the First Amended Complaint and Jury Demand.

157.     Defendants deny the allegations in paragraph 157 of the First Amended Complaint and Jury Demand.

158.     Defendants deny the allegations in paragraph 158 of the First Amended Complaint and Jury Demand.

159.     Defendants deny the allegations in paragraph 159 of the First Amended Complaint and Jury Demand.

160.     Defendants deny the allegations in paragraph 160 of the First Amended Complaint and Jury Demand.

161.     Defendants admit the allegations in paragraph 161 of the First Amended Complaint and Jury Demand and answering further, refer to the document titled "Employment

Agreement" in the first and second sentences of paragraph 161 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents

162.    Defendants deny the allegations in paragraph 162 of the First Amended Complaint and Jury Demand.

163.    Defendants deny the allegations in paragraph 163 of the First Amended Complaint and Jury Demand, and answering further, refer to the documents titled "Termination Letter" in the first sentence of paragraph 163 of the First Amended Complaint and Jury Demand and the document titled "Employment Agreement" in the first, second and third sentences of paragraph 163 of the First Amended Complaint and Jury Demand for a full and accurate statement of their contents, respectively.

164.    Defendants deny the allegations in paragraph 164 of the First Amended Complaint and Jury Demand.

165.    Defendants aver that allegations contained in paragraph 165 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 165 of the First Amended Complaint and Jury Demand.

166.    Defendants aver that allegations contained in paragraph 166 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 166 of the First Amended Complaint and Jury Demand.

167.    The bold headings immediately preceding paragraph 167 of the First Amended Complaint and Jury Demand contain no factual allegations and thus no answer to is required.  To the extent the headings immediately preceding paragraph 167 of the First Amended Complaint

and Jury Demand are deemed to contain factual allegations, they are denied.  Defendants incorporate by reference their responses to paragraphs 1 through 166 of the First Amended Complaint and Jury Demand as if set forth fully herein.

168.    Defendants deny the allegations in paragraph 168 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled " Bye-Laws" in paragraph 168 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

169.    Defendants admit the allegations in paragraph 169 of the First Amended Complaint and Jury Demand.

170.    Defendants admit the allegations in paragraph 170 of the First Amended Complaint and Jury Demand.

171.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 171 of the First Amended Complaint and Jury Demand.

172.    Defendants deny the allegations in first sentence of paragraph 172 of the First Amended Complaint and Jury Demand, but admit the allegations in the second sentence of paragraph 172 of the First Amended Complaint and Jury Demand.

173.    Defendants deny the allegations in paragraph 173 of the First Amended Complaint and Jury Demand.

174.    Defendants deny the allegations in paragraph 174 of the First Amended Complaint and Jury Demand, and answering further, refer to the document titled " Bye-Laws" in paragraph 174 of the First Amended Complaint and Jury Demand for a full and accurate statement of its contents.

175.    Defendants aver that allegations contained in paragraph 175 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 175 of the First Amended Complaint and Jury Demand.

176.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 176 of the First Amended Complaint and Jury Demand.

177.    Defendants aver that allegations contained in paragraph 177 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 177 of the First Amended Complaint and Jury Demand.

178.    Defendants aver that allegations contained in paragraph 178 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 178 of the First Amended Complaint and Jury Demand.

179-185.      No answer is required as partial motion to dismiss is being filed with respect to Count IX, paragraphs 179 through 185, of the First Amended Complaint and Jury Demand.  To the extent a response is required, the allegations in these paragraphs are denied.

186.    Defendants aver that allegations contained in paragraph 186 of the First Amended Complaint and Jury Demand are Plaintiff's legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations contained in paragraph 186 of the First Amended Complaint and Jury Demand.

**Jury Demand**

Trial by jury is demanded on all counts so triable.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

### First Defense

This action is barred, in whole or in part, because Plaintiff fails to state any claim upon which relief may be granted.

### Second Defense

This action is barred, in whole or in part, because Plaintiff breached his employment agreement with the Company.

### Third Defense

Plaintiff's breach of contract claims are barred by Plaintiff's failure of performance, his material breaches of the referenced contract and/or the Companies' right of setoff under those contracts.

### Fourth Defense

This action is barred, in whole or in part, for failure to satisfy contractual conditions precedent.

### Fifth Defense

This action is barred, in whole or in part, because the Companies met all of their contractual and legal obligations.

### Sixth Defense

This action is barred, in whole or in part, because to the extent the Companies breached any contractual obligation, which is expressly denied, it was not a material breach.

### Seventh Defense

This action is barred, in whole or in part, because at all times the Companies acted in good faith.

### Eighth Defense

This action is barred, in whole or in part, by the after-acquired evidence doctrine.

### Ninth Defense

This action is barred, in whole or in part, because Plaintiff fraudulently deceived the Companies into believing that he was in good standing with the Company during his employment.

### Tenth Defense

This action is barred, in whole or in part, by the doctrines of waiver, estoppel, and/or unclean hands.

### Eleventh Defense

This action is barred, in whole or in part, because to the extent that Plaintiff suffered any damages, such damages were caused, in whole or in part, by Plaintiff's own conduct. N.H. Rev. Stat. Ann. § 507:7-d.

### Twelfth Defense

This action is barred, in whole or in part, because of failure to act reasonably to mitigate damages, if any.

### Thirteenth Defense

To the extent that any claim in this action seeks exemplary or punitive damages, any such relief would violate statutory limitations on damages, and/or the Companies' rights to procedural and substantive due process under the Fourteenth Amendment of the United States Constitution and the Constitution of the State of New Hampshire, as well as New Hampshire's ban on punitive damages.

**Fourteenth Defense**

Plaintiff's intentional interference with contractual relations claim is barred, in whole or in part, because Markel had a legally protected interest, Markel acted in good faith to protect such interest and Markel acted by appropriate means.

**Fifteenth Defense**

Plaintiff is not entitled to recover in the absence of proof that the statements alleged in the First Amended Complaint and Jury Demand are not substantially true.

**Sixteenth Defense**

The Companies are immune from liability for any online publication of the statements alleged in the Complaint under Section 230 of the federal Communications Decency Act.

**Seventeenth Defense**

The statements alleged in the First Amended Complaint and Jury Demand are protected by the First Amendment to the United Statements Constitution and by the Constitution of the State of New Hampshire.

**Eighteenth Defense**

To the extent that Plaintiff may be found to be a public figure, Plaintiff is not entitled to recover in the absence of proof, by clear and convincing evidence, that the statements alleged in the First Amended Complaint and Jury Demand were published with actual (i.e., constitutional) malice.

**Nineteenth Defense**

The statements alleged in the First Amended Complaint and Jury Demand are protected by one or more privileges under state or federal law.

### Twentieth Defense

The statements alleged in the First Amended Complaint and Jury Demand were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds, of its truth, and therefore, were conditionally privileged.

### Twenty-First Defense

Plaintiff is not entitled to recover where the incremental harm caused by any false statements alleged in the First Amended Complaint and Jury Demand is negligible in relation to the "sting" of those statements which were indisputably true.  See Thomas v. Telegraph Publishing Company, 929 A.2d 993 (N.H. 2007).

### Twenty-Second Defense

The statements alleged in the First Amended Complaint and Jury Demand dealt with matters of public concern.

The Companies hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case and hereby reserve their right to amend their answer and assert such defenses.

### COUNTERCLAIMS

### Preliminary Statement

1.      Belisle suing the Companies is the height of irony.  He is the wrongdoer, not the victim.  Fifty-six-year-old Belisle, former Chief Executive Officer of MCIM, maintained a romantic and/or sexual relationship with his thirty-seven-year-old direct subordinate at MCIM, Alissa Fredricks ("Ms. Fredricks"), for more than a year while both were working at the Company.  During this period and on Belisle's recommendation, she was promoted to CEO, Bermuda, and provided with significant enhancements to her compensation.  All the while,

Belisle failed to disclose his romantic and/or sexual relationship with her.  The Company learned of this relationship only in connection with collecting information to respond to several coordinated government inquiries into loss reserves at MCIM (the "Government Inquiries"). Indeed, Belisle even denied the romantic and/or sexual relationship and lied to the Companies when he was directly asked about it. Belisle acknowledged his lies only when he realized that, notwithstanding his deletion of text messages with Ms. Fredricks, there was documentary proof of his romantic and/or sexual relationship with her.  Belisle's misconduct left MCIM no choice but to terminate his employment for "Cause" pursuant to his employment agreement.  Following the termination of his employment, Belisle has refused to return the Companies' property including, but not limited to, documents that contain the Companies' trade secrets, confidential and proprietary information, in further violation of his employment agreement.

## Parties

2.      Defendant-counterclaim plaintiff Markel CATCO Investment Management Ltd. is a Bermuda exempted company with limited liability, with a principal place of business in Bermuda.

3.      Defendant-counterclaim plaintiff Markel Corporation is a corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Virginia.

4.      Plaintiff-counterclaim defendant Anthony Belisle is an individual and is a resident of Florida.

## Jurisdiction

5.      The Court has subject matter jurisdiction over the Companies' counterclaims under 28 U.S.C. § 1331 because they arise under the Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376 (codified in scattered sections of 18, 28 and 34 U.S.C.), and under 28

U.S.C. § 1367(a) because they are so related to Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution.

6.     The Court further has subject matter jurisdiction over the Companies' counterclaims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Companies and Plaintiff and the amount in controversy exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1367(a) because the counterclaims are so related to Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction.  Venue is also proper in this district because Plaintiff-counterclaim defendant consented to subject to the jurisdiction of this court in his employment agreement with MCIM dated September 9, 2015 (the "Employment Agreement").  A copy of the Employment Agreement and all addendums thereto is attached as Exhibit A.

8.     The Employment Agreement calls for the application of New Hampshire law to any dispute regarding the Employment Agreement.  (See Ex. A § 16.1.)

**Facts Relevant to All Claims**

A.     *Background*

9.     Markel is a diverse financial holding company serving a variety of niche markets. Through various subsidiaries, its principal business is to market and underwrite specialty insurance products.  Among other things, Markel subsidiaries provide investment management services.

10.     On or about September 9, 2015, Markel entered into an agreement to purchase substantially all of the assets of CATCo Investment Management Ltd. ("CATCo IM") and CATCo-Re Ltd. (the "CATCo Transaction"), Belisle's prior business. MCIM was created in December 2015 to hold substantially all of the assets, including all intellectual property and models of CATCo IM.   On December 8, 2015, Markel announced the completion of the acquisition of substantially all of the assets of CATCo IM and CATCo-Re Ltd.   Upon the acquisition, these assets transferred to MCIM for more than $200 million.

11.     MCIM is an insurance-linked securities investment fund manager headquartered in Bermuda focused on building and managing highly diversified, collateralized retrocession and reinsurance funds covering global property catastrophe risks.   MCIM builds and manages concentrated, diversified funds designed to deliver meaningful market outperformance for its clients and investors.   These funds provide MCIM's investors the opportunity to participate in the returns from a selected mix of investments linked to reinsurance risks.   MCIM receives management fees for its investment and insurance management services, as well as performance fees based on the annual performance of the investment funds that it manages.   Its public funds are now in "runoff."

B.     *Belisle's Employment Agreement*

12.     Effective as of the closing of the CATCo Transaction, MCIM offered Belisle employment as the Chief Executive Officer of MCIM, reporting directly to the board of directors of MCIM (the "MCIM Board"), and with an annual base salary of $1,000,000, in addition to other incentive compensation and benefits.   (See Ex. A.)

13.     Belisle accepted MCIM's employment offer on the same date and executed the Employment Agreement.   (See id. at 13.)

14.     On December 8, 2015, Belisle commenced employment with MCIM.

15.     Pursuant to the Employment Agreement, Belisle was eligible to receive incentive compensation comprising a "Continued Service Element" and a "Performance Element," (collectively, "Incentive Compensation"), subject to certain terms and conditions.  (Id. Schedule 1.)

16.     The Employment Agreement provided, in relevant part:

> Continued Service Element
>
> [Belisle] shall be eligible to receive a total gross aggregate Continued Service Element of the Incentive Compensation equal to US $37,500,000. [Belisle] shall earn one-third (1/3) of such total gross aggregate Continued Service Element (i.e., US $12,500,000) as of each of the following dates (each such date, a "vesting date," and each such payment, a "Retention Payment"):
>
> - December 31, 2016;
>
> - December 31, 2017; and
>
> - December 31, 2018;
>
> provided in each case that [Belisle] complies with this [Employment] Agreement . . . and remains actively and continuously employed in good standing with the Company as of each such applicable vesting date (and subject to the remaining provisions below). Any such earned Retention Payment shall be paid within thirty (30) calendar days after the applicable vesting date upon which it becomes earned.
>
> Performance Element
>
> [Belisle] shall be eligible to receive a total gross aggregate target Performance Element of the Incentive Compensation based on Fee Income received during the Retention and Performance Period [January 1, 2016 through December 31, 2018], provided that [Belisle] complies with this [Employment] Agreement . . . and remains actively and continuously employed in good standing with the Company throughout the Retention and Performance Period (and subject to the remaining provisions below).

(Id. Schedule 1 at 2-3 (emphases added, except in headings).)

17.     The total aggregate target Performance Element of the Incentive Bonus that Belisle was eligible to receive pursuant to the terms and conditions of the Employment Agreement depended on the net fees received by MCIM and certain related entities over a period of time.  (See id. Schedule 1 at 1-3.)

18.     The Employment Agreement required Belisle to undertake certain duties during his employment with MCIM, including, among others, to:

a.   "undertake and faithfully and diligently perform all such duties, and exercise such powers and functions, as may be assigned to or vested in [him] from time to time by the Board" (id. § 3.1(a));

b.   "at all times conform to the good faith and lawful directions of the Board" (id. § 3.1(c));

c.   "act at all times in the best interests, and promote and protect the interests, of the Company" (id. § 3.1(e));

d.   "promptly disclose in writing to the Company, so far as [he] is aware of the same, the nature of any personal interest of [Belisle], whether direct or indirect, in any contract or proposed contract entered into by the Company" (id. § 3.2(c)); and

e.   "conduct [his] activities on behalf of the Company, and otherwise act, in compliance with all proper standards of corporate governance, and with all applicable policies and procedures of the Company and its affiliates, each as in effect or as amended from time to time" (id. § 3.2(d)).

19.     Pursuant to the Employment Agreement, Belisle's employment "may be terminated by the Company at any time for any or no reason"" including with "Cause."  (Id. § 9.1(a).)  Further, under the Employment Agreement, Belisle's "eligibility for certain Incentive

Compensation (or a portion thereof), if any, in connection with a termination of [Belisle]'s employment is governed by and subject to the terms and conditions set forth in Schedule 1."  (Id. § 10.2.)

20.     Schedule 1 of the Employment Agreement provides, in relevant part:

"Cause" means any of the following conduct by [Belisle], as determined in good faith by the Company: (A) embezzlement, misappropriation of corporate funds, or other material acts of dishonesty; . . . (C) engagement in any activity that [Belisle] knows or reasonably should know will or could materially harm the business or reputation of the Company or any of its affiliates; (D) refusal to perform or disregard of [Belisle]'s duties and responsibilities, or failure to adhere to the Company's or any of its affiliates' applicable corporate codes, policies or procedures, as in effect or amended from time to time; or (E) material breach of the Agreement (including without limitation Section 8) or other material obligation to the Company or any of its affiliates . . . . Notwithstanding the foregoing, the Company shall not terminate [Belisle]'s employment pursuant to subparts (C), (D) or (E) above unless it first gives [Belisle] notice of and a reasonable opportunity to cure any such grounds for termination (provided that no such notice and cure opportunity shall be required as to any such grounds that are not reasonably susceptible to a cure under the circumstances).

. . . .

Termination Provisions

Notwithstanding the foregoing:

. . . .

(c) in the event the Company terminates [Belisle]'s employment for Cause . . . with an effective employment termination date prior to the last day of the Retention and Performance Period, or in the event [Belisle] at any time breaches any of [Belisle]'s continuing post-employment obligations under the [Employment] Agreement . . . , [Belisle] shall not be entitled to, or receive, any then-unearned or unpaid Retention Payments or any Performance Element of the Incentive Compensation (or any portion thereof).

(Id. Schedule 1 at 1, 3-4.)

21.    The Employment Agreement also bound Belisle to certain postemployment restrictions:

> Confidentiality, Intellectual Property and Restrictive Covenants.
>
>     . . . .
>
> 8.2 [Belisle] acknowledges and agrees that all Confidential Information is, shall be and shall remain the property of the Company.  [Belisle] agrees and covenants with the Company, as follows, subject in each case to Section 11 below:
>
> (a) Except as required by law or as authorized in advance by the Company in furtherance of [Belisle's] employment, [Belisle] shall not, at any time during or after the Employment Period, directly or indirectly use, disclose, reproduce, or take any action which may result in the use, disclosure or reproduction of, any Confidential Information for any purpose whatever, including without limitation for [Belisle's] own benefit, for that of any other party or in any way to the detriment of the Company or any of its affiliates.
>
>     . . . .
>
> (d) "Confidential Information" as used in this [Employment] Agreement means all confidential competitively sensitive and proprietary information or materials relating or belonging to the Company or any of its affiliates (in whatever form, whether or not reduced to writing, whether held in hard copy or any electronic medium, and whether or not acquired by the Company pursuant to the Purchase Agreement or otherwise acquired or developed) . . . . "Confidential Information" does not include information that lawfully is or becomes generally and publicly known outside of the Company and its affiliates other than through [Belisle's] breach of this [Employment] Agreement or breach by another person or entity of some other obligation.
>
>     . . . .
>
> 8.7 Promptly upon termination of [Belisle's] employment by either party for any or no reason, or, if earlier, upon request of the Company, [Belisle] shall return to the Company any and all property of the Company, its affiliates, or the actual and prospective ceding insurer clients or investors of any of them, including without limitation any documents or things containing

any Confidential Information, computer programs and drives or storage devices of any kind (portable or otherwise), minutes, memoranda, correspondence, files, forms, notes, records, charts, or any copies thereof (in whatsoever form held and whether or not held on computer storage media), further including without limitation any and all laptops and other computer equipment, blackberries and similar devices, cellphones, credit cards, keys and other access cards, and electronic and hardcopy files.

(Id. §§ 8, 8.2, 8.2(a), (d), 8.7.)

### C.    *Code of Conduct*

22.    The Companies maintain a Code of Conduct, which is provided to all employees and is published on the Companies' intranet and internet websites (the "Code of Conduct").  All employees are expected to acknowledge the Code of Conduct upon commencement of employment, and then periodically thereafter, and follow it at all times.  A copy of the 2017 Code of Conduct is attached as Exhibit B.

23.    The Code of Conduct, in effect in 2017, provided, in relevant part:

> **Avoid Conflicts of Interest.   No Associate, Executive Officer or Director should allow outside interference or private interests to affect his/her contribution to the Company.   This includes being sensitive to the "appearance" of a conflict of interest.**
>
> **Explanation of Policy:** A "conflict of interest" or the "appearance of conflict of interest" exists when a person's private interest interferes in any way with the interests of the Company.  A conflict situation can arise when an Associate, Executive Officer or Director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively.  A conflict of interest, or the appearance of a conflict of interest, may also arise when an Associate, Executive Officer or Director, or members of his or her family, are involved in transactions with the Company. Often, the appearance of a conflict may be overcome if the relevant facts are fully disclosed to an impartial decision maker for approval.

**Requirements:**

- **Avoid conflicts.**   All Associates, Executive Officers and Directors should avoid actual or apparent conflicts of interest.

- **Disclose potential conflicts.**   Any time you believe a conflict of interest may exist, you must disclose the potential conflict of interest to your supervisor.   Any activity that is approved, despite the actual or apparent conflict, must be documented.

- **Obtain approval if required.**   A potential conflict of interest that involves an executive officer or director must be approved by our Board of Directors or its designated committee.   A potential conflict of interest involving an Associate with the title Managing Director and above must be approved by the General Counsel and may be reported to our Board of Directors or its designated committee.

(Ex. B, at 2.)

24.     The Code of Conduct provides examples of some situations that may cause a conflict of interest or the appearance of a conflict of interest, but notes that "[i]t is not possible to describe every conflict of interest."  (Id.)

25.     On March 7, 2017, Belisle acknowledged, and agreed to abide by, the Code of Conduct.  A copy of Belisle's acknowledgement to the 2017 Code of Conduct is attached as Exhibit C. Specifically, Belisle acknowledged that he was in compliance with the Code of Conduct and would promptly report any change that would affect the accuracy of that statement. (See Ex. C.)

26.     Effective for 2018, the Companies updated certain contact information in the Code of Conduct, but the prohibition relating to conflicts of interest remained unchanged.  A copy of the 2018 Code of Conduct is attached as Exhibit D.

27.     On February 13, 2018, Belisle acknowledged, and agreed to abide by, the 2018 Code of Conduct.  A copy of Belisle's acknowledgement to the 2018 Code of Conduct is attached as Exhibit E.  Belisle again acknowledged that he was in compliance with the Code of

Conduct and would promptly report any change that would affect the accuracy of that statement. (<u>See</u> Ex. E.)

28.     On November 14, 2018, weeks before Markel received notice of the Government Inquires, or knew of a romantic and/or sexual relationship between Belisle and Ms. Fredricks, and after an in-depth review of the Code of Conduct, the board of directors of Markel approved certain updates to the Code of Conduct, including adding additional examples of types of conflicts.  A copy of the 2019 Code of Conduct is attached as <u>Exhibit F</u>.  The prohibition relating to conflicts of interest remained materially unchanged.  (<u>See</u> Ex. F, at 5.)

29.     The 2019 Code of Conduct was published on Markelcorp.com on January 2, 2019.

30.     On January 10, 2019, the 2019 Code of Conduct was emailed to Belisle.

**D.**     ***Alissa Fredricks' Employment and Promotions***

31.     MCIM offered Ms. Fredricks the position of Senior Actuary, commencing May 2, 2016, in Wellesley, Massachusetts, and reporting to Sam Niles, then Chief Actuary (the "Fredricks Offer Letter").  Under the Fredricks Offer Letter, Ms. Fredricks was paid an annual base salary of $145,000, as well as a $10,000 sign-on bonus.  A copy of the Fredricks Offer Letter and all addendums thereto is attached as <u>Exhibit G</u>.

32.     By an addendum to the Fredricks Offer Letter, dated October 27, 2016, Ms. Fredricks' annual salary increased to $175,000, and she was promoted to the position of Chief Risk Officer.  As part of this promotion, Ms. Fredricks agreed to relocate to the Company's Bermuda office in the first quarter of 2017.  (<u>See</u> Ex. G.)

33.     In connection with her employment in Bermuda, Ms. Fredricks entered into an employment agreement, dated December 21, 2016, setting forth the terms and conditions of her

employment once she relocated to Bermuda, including a $72,000 per year housing allowance (the "Fredricks Employment Agreement").  A copy of the Fredricks Employment Agreement and all addendums thereto is attached as Exhibit H.

34.     On or about April 3, 2017, Ms. Fredricks commenced employment for the Company in Bermuda as the Company's Chief Risk Officer and received a $3,500 raise, increasing her total annual base salary to $178,500.  In this role, Ms. Fredricks was responsible for overseeing the Company's portfolio and underwriting activity.  She reported directly to the Company's then Chief Executive Officer, Belisle.

35.     By an addendum dated May 30, 2017, effective June 1, 2017, Ms. Fredricks received a $50,000 raise, increasing her total annual base salary to $228,500, as well as an increase of $48,000 to her housing allowance, increasing her annual housing allowance to $120,000.  (Ex. H.)

36.     Unbeknownst to MCIM or Markel, at some time in the Fall of 2017, and no later than October 2017, Belisle and Ms. Fredricks became involved in a romantic and/or sexual relationship.

37.     Belisle concealed the relationship from MCIM and Markel.

38.     Ms. Fredricks also concealed the relationship from MCIM and Markel.

39.     Belisle and Ms. Fredricks traveled together, often internationally, at MCIM's expense during the period of their romantic and/or sexual relationship.

40.     In November 2017, Belisle recommended to Markel and the MCIM Board that Ms. Fredricks be promoted to CEO, Bermuda, and receive a significant raise.  Belisle further recommended to Markel that Ms. Fredricks receive an additional $50,000 bonus.

41.     Belisle did not disclose his romantic and/or sexual relationship with Ms. Fredricks to MCIM or Markel.

42.     The $50,000 bonus was approved by Markel and received by Ms. Fredricks on November 15, 2017.

43.     A few months into their romantic and/or sexual relationship, by an addendum dated December 23, 2017, Ms. Fredricks was promoted to CEO, Bermuda, retroactive to November 1, 2017, and received a $171,500 raise, increasing her total annual base salary to $400,000.  (See id.)  In this role, Ms. Fredricks continued to report directly to Belisle.

44.     Thereafter, Belisle's romantic and/or sexual relationship with Ms. Fredricks continued.

45.     By January 2018, Belisle and Ms. Fredricks actively sought to hide their romantic and/or sexual relationship from the Company and others.

46.     Belisle still did not disclose his romantic and/or sexual relationship with Ms. Fredricks to MCIM or Markel.

47.     By an addendum dated March 14, 2018, Ms. Fredricks received a $15,000 raise effective March 1, 2018, increasing her total annual base salary to $415,000.  (Id.)

48.     Belisle and Ms. Fredricks further continued their romantic and/or sexual relationship.

49.     In June 2018, Belisle recommended to Markel that Ms. Fredricks receive significant additional incentive compensation.

50.     Belisle still did not disclose his romantic and/or sexual relationship with Ms. Fredricks to MCIM or Markel.

51.     By letter dated October 19, 2018, and executed directly by Belisle, Ms. Fredricks became eligible to receive certain additional incentive compensation, including a Continued Service Bonus in the amount of $450,000 and a Retention Bonus in the amount of $7,000,000. (See id.)

52.     Belisle's romantic and/or sexual relationship with Ms. Fredricks continued.

53.     On January 6, 2019, in connection with negotiating his own incentive compensation, Belisle recommended that Ms. Fredricks receive an additional $3,000,000 directly out of his Performance Bonus no later than January 31, 2019.  Belisle did not recommend any other employee for additional compensation.

54.     When making the recommendation, Belisle still did not disclose his romantic and/or sexual relationship with Ms. Fredricks to MCIM or Markel.

55.     The documentary evidence shows that Belisle and Ms. Fredricks maintained a romantic and/or sexual relationship from at least mid-October 2017 until at least December 4, 2018, the date they were notified of the Government Inquiries.  Ms. Fredricks admitted that their personal relationship continued after December 4, 2018.

E.     *Mobile Device and BYOD Security Policy and Acceptable Use Policy*

56.     At all relevant times, MCIM maintained a Mobile Device and BYOD Security Policy (the "Mobile Device Policy") and Acceptable Use Policy (the "Acceptable Use Policy"). Belisle knew or should have known about these policies.  A copy of the Mobile Device Policy is attached as Exhibit I, and a copy of the Acceptable Use Policy is attached as Exhibit J.

57.     On October 2, 2018, the MCIM Board approved the Mobile Device Policy and the Acceptable Use Policy.  Ms. Fredricks chaired this meeting as Belisle was not in attendance.

However, leading up to the October 2, 2018, MCIM Board meeting, Belisle received several emails about, and attaching, the Mobile Device Policy and the Acceptable Use Policy.

58.     The Mobile Device Policy applies to "[a]ll mobile devices, whether owned by [MCIM] or owned by associates, inclusive of smartphones and tablet computers, that have access to corporate networks, data and systems."  (Ex. I, at 1.)

59.     The Mobile Device Policy requires all devices under the policy to be registered in the Company's mobile device management system.  (Id.)

60.     Belisle registered two devices with the Company's mobile device management system.  On October 17, 2017, Belisle registered his Company-owned laptop (the "Laptop"), and on October 18, 2017, Belisle registered his personal cell phone that he used for work purposes and for which MCIM reimbursed him for the cost.

61.     The Acceptable Use Policy applies to all "devices that connect to a Company network" (Ex. J, at 1) and states:

> Associates must ensure that they do not . . . [u]se third-party email systems and storage systems to conduct Company business or store Company data. . . .
>
> . . . .
>
> . . . [T]here is no privacy in the use of any part of the electronic communication system or in any documents, messages or information created on, with or transmitted over the system. The Company has access to the system and maintains the right to access and monitor, consistent with the law, all documents, messages and information created on, with or transmitted over the system, including e-mail and Internet usage, without notice.
>
> Employees are deemed to consent to that access and review, provided that the Company will access stored messages only when it has a reasonable suspicion that the messages relate to a violation of Company policy or any applicable law or regulation and then only as reasonably required for that purpose.  All such documents, messages, and information can be reviewed by the Company.

. . . .

<u>Right to Search</u>

The Company reserves the right to inspect and search all computers, electronic devices, and components of the electronic communication system without notice to ensure that associates are complying with this and other Company policies. . . .

All of the foregoing requirements also apply to any other personal device that connects with the Company's electronic communication system.

(<u>Id.</u> at 2-3.)

**F.    *Government Inquiries and Discovery of Undisclosed Personal Relationship***

62.    On November 30, 2018, the U.S. Department of Justice contacted Markel with inquiries and requests for documents about the loss reserves recorded in late 2017 and early 2018 at MCIM and its subsidiaries.  On December 5, 2018, the Bermuda Monetary Authority informed Markel that it was going to review the same information.  On December 6, 2018, the U.S. Securities and Exchange Commission also indicated that it had the same inquiries and requests (i.e., the "Government Inquiries").

63.    On November 30, 2018, Markel retained Skadden, Arps, Slate, Meagher & Flom LLP ("Outside Counsel") as outside counsel to conduct an internal review in response to the Government Inquiries.

64.    As part of the review, on December 4, 2018, the MCIM Board, which consisted of Belisle, Ms. Fredricks, Kerri Duggan and Michael Toyer, signed a board resolution, a copy of which is attached as <u>Exhibit K</u>, approving Outside Counsel to, among other things, "collect any information and documents relating to or under the control of [MCIM] that may be relevant to the [Government] [I]nquir[ies] and any matters arising therefrom."  (Ex. K.)  The MCIM Board further authorized Markel to "make disclosure of such information and documents to any

relevant governmental or regulatory authority, as may be necessary, appropriate or considered desirable." (Id.)

65.     Among other things, the Government Inquiries specifically requested any documents, including emails, related to loss reports, loss estimates and the calculation of losses or loss estimates for MCIM and its subsidiaries.  Belisle possessed information responsive to these inquires.  For example, Belisle, as then Chief Executive Officer of MCIM, tracked this information, received updates on it from Ms. Fredricks, as CEO, Bermuda, and provided input on the setting of loss reserves to Ms. Fredricks.

66.     Further on December 4, 2018, a preservation notice was emailed to certain MCIM employees, including Belisle, informing them to preserve and not destroy, discard or alter any potentially relevant documents, noting that the term "documents" includes, among other things, text messages and instant messages.

67.     On the evening of December 4, 2018, while in Bermuda, Belisle provided his personal cell phone and Laptop, both of which were registered with MCIM's mobile device management system, to Outside Counsel's third-party forensic vendor, Consilio LLC ("Consilio"), to forensically image.  However, Belisle represented that he could not remember the password for his Apple account that was necessary for imaging of his personal cell phone, so he instead provided the cell phone on December 5, 2018, after he reset the password.  Belisle further informed Outside Counsel that he backed up the Laptop on an external hard drive, which he did not have with him, for imaging.

68.     On December 6, 2018, in a written press release, Markel informed investors and others of the Government Inquiries, a copy of which is attached as Exhibit L, and stated:

> Markel Corporation (NYSE: MKL) said today that after having been contacted on November 30, 2018, it is fully cooperating with

> inquiries by US and Bermuda authorities into loss reserves
> recorded in late 2017 and early 2018 at Markel CATCo Investment
> Management Ltd and its subsidiaries.  These inquiries are limited
> to Markel CATCo Investment Management Ltd and its subsidiaries
> and do not involve other Markel Corporation companies.  Outside
> counsel has been retained to conduct an internal review.  The
> company has no further statement at this time.

69.     As part of its review, Outside Counsel interviewed Belisle, Ms. Fredricks and
other MCIM employees.  On December 13, 2018, Outside Counsel conducted the first of two
interviews with Belisle.  At the beginning of the interview, Outside Counsel informed Belisle
that Outside Counsel represented Markel and not him individually.  The interview focused on the
loss-reserve matters described in the Government Inquiries.

70.     Belisle did not disclose his romantic and/or sexual relationship with Ms. Fredricks
during this interview.

71.     As part of this initial phase of document review in response to the Government
Inquiries, several emails were discovered on MCIM's email system from November and
December 2017 between Belisle and Ms. Fredricks that strongly suggested the existence of a
romantic and/or sexual relationship between them.

72.     Other emails from January 2018 showed Belisle directing Ms. Fredricks to check
third-party messaging applications such as iMessage, SMS and WhatsApp.

73.     Based on the evidence discovered on the Company's system, the nature of the
Government Inquiries and pursuant to its policies, including its Acceptable Use Policy, MCIM
had the right and obligation to search, and the reasonable suspicion to review, messages and
other documents stored on the forensic image of Belisle's personal cell phone for violations of
Company policy.

74.     It was confirmed that Belisle was in fact conducting MCIM business over
unauthorized third-party messaging applications in violation of Company policy.

75.     Further, the messages Belisle sent over various unauthorized third-party messaging applications confirmed a romantic and/or sexual relationship with Ms. Fredricks.

76.     On January 17, 2019, Outside Counsel conducted a follow-up interview with Belisle (the "Second Interview").  At the beginning of the interview, Outside Counsel informed Belisle that Outside Counsel represented Markel and not him individually.

77.     During the Second Interview, Belisle was asked if he had been involved in a romantic and/or sexual relationship with Ms. Fredricks.

78.     Belisle denied ever having a romantic and/or sexual relationship with Ms. Fredricks.

79.     When asked if it would be fair to say that investors would expect there would not be an intimate relationship between himself and Ms. Fredricks, Belisle responded in the affirmative.

80.     Once informed by Outside Counsel that they had seen emails implying a romantic and/or sexual relationship, Belisle admitted he had a romantic and/or sexual relationship with Ms. Fredricks.

81.     Belisle admitted that he lied about his relationship with Ms. Fredricks.

82.     Belisle admitted that the romantic and/or sexual relationship began in the fall of 2017 and continued up until the Government Inquiries.

83.     Belisle admitted that he deleted messages from his cell phone related to his relationship with Ms. Fredricks before it was forensically imaged by Consilio.

84.     Belisle also admitted that he asked Ms. Fredricks whether she had deleted messages from her cell phone related to their relationship before it was forensically imaged by Consilio.

85.     At the end of the interview, Belisle provided his new personal cell phone, which he had recently purchased, to Consilio so it could be forensically imaged.  Belisle stated that he dropped and cracked the screen of his prior cell phone and his daughter was using it.

86.     The forensic image of Belisle's new phone did not contain any email, text messages or other data at all.

87.     The forensic image of Belisle's new phone presented itself as either an entirely new phone that had not yet been used or a phone that had been recently wiped clean.

88.     By comparison, the forensic image of Ms. Fredricks' cell phone showed that Belisle and Ms. Fredricks communicated by cell phone during the period between the forensic images of their cell phones, including a message sent by Belisle to Ms. Fredricks' just days before Belisle's Second Interview.

**G.**     ***Termination for Cause of Belisle's Employment with MCIM***

89.     On January 18, 2019, the disinterested members of the MCIM Board terminated Belisle's employment for "Cause" under the Employment Agreement.

90.     MCIM issued a press release the same date, a copy of which is attached as Exhibit M, stating, in relevant part:

> Markel CATCo Investment Management Ltd. (Markel CATCo) said today that effective immediately, Anthony Belisle, Chief Executive Officer, and Alissa Fredricks, Chief Executive Officer – Bermuda, are no longer with the company.
>
> As previously announced by Markel Corporation, the company's parent corporation (Markel), after being notified of governmental inquiries into loss reserves recorded in late 2017 and early 2018 at the company and its subsidiaries, engaged outside counsel to conduct an internal review.  During the course of the internal review, Markel discovered violations by Mr. Belisle and Ms. Fredricks of Markel policies relating to an undisclosed personal relationship, and prompt action was taken.  The internal review relating to loss reserving continues with no conclusions reached at this time.

(Ex. M, at 1.)

91.     Markel also issued a press release the same date, a copy of which is attached as

Exhibit N, stating, in relevant part:

> Markel Corporation (NYSE: MKL) said today that effective immediately, Anthony Belisle, Markel CATCo Chief Executive Officer, and Alissa Fredricks, Markel CATCo Chief Executive Officer – Bermuda, are no longer with the company.
>
> As previously announced, after being notified of governmental inquiries into loss reserves recorded in late 2017 and early 2018 at Markel CATCo Investment Management Ltd and its subsidiaries (Markel CATCo), Markel Corporation (Markel) engaged outside counsel to conduct an internal review.  During the course of the internal review, Markel discovered violations by Mr. Belisle and Ms. Fredricks of Markel policies relating to an undisclosed personal relationship, and prompt action was taken. The internal review relating to loss reserving continues with no conclusions reached at this time.

(Ex. L, at 1.)

92.     Following Belisle's termination of employment, MCIM requested the return of

any and all information and documents in Belisle's possession relating to or belonging to the

Companies or their affiliates, including, but not limited to, the Laptop and Company iPad.

93.     Belisle did not return all of the information and documents in his possession

relating to or belonging to the Companies or their affiliates upon the termination of his

employment.

94.     Belisle refused to sign a certification confirming the return of all such property of

the Companies.

**H.      *Standstill Agreement***

95.     On or about the week of January 23, 2019, through counsel, Belisle asserted that

he would not be returning the Companies' information and documents in his possession

including information on his personal cell phones and external hard drive, or the Laptop and

Company iPad.   Instead, Belisle had forensic images made of the devices and retained the originals and the forensic images.

96.   Given the need to protect the Companies' property, MCIM agreed, on February 8, 2019, to enter into a standstill arrangement with Belisle under which both sides agreed that no one would access the devices or forensic images while the parties tried to work out their issues (the "Standstill Agreement").   However, MCIM required that no one be allowed to access any of the Companies' property or information stored on the devices or forensic images for at least five (5) business days after the Standstill Term (as defined in the Standstill Agreement) expired in order to allow time to pursue an action in court.

97.   On February 19, 2019, Belisle, through his counsel, provided notice that the Standstill Agreement was terminated.

98.   On February 21, 2019, Belisle filed his complaint in this Court against the Companies.

99.   On February 22, 2019, the parties reached a further agreement that Belisle and his counsel would not access or allow any other person to access any of the Companies' property or information stored on the devices or forensic images unless and until they provided five (5) business days' advance written notice to MCIM.

100.   To date, no such notice has been provided, and each party reserved all substantive rights.

**I.**   *Harm to the Companies*

101.   Based on Belisle's conduct including, but not limited to, violating the Code of Conduct and directly lying during the Second Interview when asked about his relationship with Ms. Fredricks, MCIM had no choice but to terminate his employment.

102.    Further, MCIM paid Belisle compensation, bonus and other benefits while he was not in compliance with the Employment Agreement including, but not limited to, his $1,000,000 annual base salary and the $12,500,000 Continued Service Element paid to him in January 2018.

103.    The carrying value of the goodwill and intangible assets of the MCIM reporting unit was reduced to zero (0), which resulted in an impairment charge of $179,000,000.

**First Counterclaim**
**Breach of Fiduciary Duty**

104.    MCIM restates and incorporates by reference all of the previous allegations herein as if fully set forth herein.

105.    Generally, an employee holding a position of trust and confidence, such as a supervisor, manager or officer, owes a fiduciary duty of loyalty, care and/or candor to his employer.  The duty demands that the employee act solely for the benefit of the employer, never to the employer's detriment.

106.    Further, an officer, including a director, of a company in exercising his powers and discharging his duties owes a duty of care to the company.  The duty demands that the officer act honestly and in good faith with a view to the best interests of the company and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

107.    Belisle served as Chief Executive Officer of MCIM and as a director on the MCIM Board.  In these positions, MCIM placed authority, responsibility and confidence in Belisle to act in good faith in a manner that was in MCIM's best interests.  MCIM reposed a special trust and confidence in Belisle to act in accordance with MCIM policies, and to disclose information regarding violations of MCIM policies that could cause harm to MCIM.

108.    Belisle betrayed this confidence by, among other things, maintaining an undisclosed romantic and/or sexual relationship with his subordinate and direct report in violation of MCIM policy, denying the romantic and/or sexual relationship and lying to MCIM until he was confronted with documentary evidence to the contrary.

109.    By reason of the foregoing conduct, MCIM has suffered damages to which it is entitled to recover.  In addition, MCIM continues to suffer immediate and irreparable harm for which it has no full, complete and adequate remedy at law.

**Second Counterclaim**
**Intentional Misrepresentation**

110.    MCIM restates and incorporates by reference all of the previous allegations herein as if fully set forth herein.

111.    Belisle made representations to MCIM including through his acknowledgements to the Code of Conduct on March 7, 2017, and February 13, 2018 (see Ex. C; Ex. E), that he was in compliance with the Code of Conduct and he would promptly report any change that would affect the accuracy of that statement.

112.    Belisle's representations to MCIM regarding compliance with the Code of Conduct were false, and he knew they were false.

113.    Additionally, on or about November 2, 2017, Belisle recommended that Ms. Fredricks receive a $50,000 bonus and be promoted to CEO, Bermuda, with a significant raise.

114.    Again, on or about June 8, 2018, Belisle recommended that Ms. Fredricks receive a $7 million retention bonus.

115.    Lastly on January 6, 2019, in connection with negotiating his own incentive compensation, Belisle recommended that Ms. Fredricks receive an additional $3,000,000 directly out of his Performance Bonus no later than January 31, 2019.

116.    At all times, Belisle did not disclose his romantic and/or sexual relationship with Ms. Fredricks to either Markel or the MCIM Board and fraudulently concealed such relationship from them.

117.    Belisle made his recommendations – and failed to disclose his romantic and/or sexual relationship with Ms. Fredricks – knowing that Markel and/or the MCIM Board would rely on his misrepresentations and concealment in approving the promotion, raise, bonus and/or incentive compensation offered to Ms. Fredricks.

118.    Given Belisle's position as Chief Executive Officer of MCIM, he had a duty to inform Markel and the MCIM Board of information that would be reasonably necessary for it to consider in deciding whether to provide Ms. Fredricks with the promotion, raise, bonus and/or incentive compensation.

119.    Belisle willfully and intentionally made his recommendation and failed to disclose his romantic and/or sexual relationship with Ms. Fredricks, knowing that Markel and the MCIM Board would rely on his recommendation and concealment in approving the promotion, raise, bonus and/or incentive compensation offered to Ms. Fredricks.

120.    Thus, Markel and the MCIM Board justifiably relied on Belisle's recommendation that Ms. Fredricks should receive a promotion, raises and incentive compensation without knowledge or information that Belisle was engaged in a romantic and/or sexual relationship with her, and ultimately did decide to provide her with the promotion, raises and incentive compensation.

121.    By reason of the foregoing conduct, Markel and MCIM have suffered damages to which they are entitled to recover.  Further, Belisle's actions were willful, wanton and undertaken with malice, subjecting Belisle to enhanced compensatory damages.

**Third Counterclaim**
**Breach of Contract**

122. The Companies restate and incorporate by reference all of the previous allegations herein as if fully set forth herein.

123. Belisle entered into the Employment Agreement, as described above, for good consideration.

124. The Employment Agreement is an enforceable contract between MCIM and Belisle.

125. The Company performed all of its obligations under the Employment Agreement.

126. Pursuant to Section 14.1 of the Employment Agreement, Markel is a third-party beneficiary to the Employment Agreement with the express right to enforce the applicable provisions of Section 8 of the Employment Agreement. (See Ex. A § 14.1.)

127. Belisle has materially breached and/or will materially breach the Employment Agreement by, among other things:

    a. engaging in an undisclosed romantic and/or sexual relationship with Ms. Fredricks;

    b. breaching his contractual duties to MCIM;

    c. failing to act in good faith;

    d. failing to adhere to the Code of Conduct;

    e. retaining, and failing to return to the Companies, the Confidential Information; and

    f. retaining, and failing to return to the Companies, the Companies' property including, but not limited to, electronic and hard-copy files, forensic images and the Company iPad.

128.    Further, since Belisle's termination of employment, he has repeatedly asserted his intention to access and use the Confidential Information he retained for his own advantage.

129.    By reason of the foregoing conduct, the Companies have suffered damages to which they are entitled to recover.  In addition, the Companies continue to suffer immediate and irreparable harm for which it has no full, complete and adequate remedy at law.

**Fourth Counterclaim**
**Violation of Defend Trade Secrets Act**

130.    The Companies restate and incorporate by reference all of the previous allegations herein as if fully set forth herein.

131.    As set forth above, Belisle had access to information regarding, among other things, all of the Companies' employees, clients, investors, business partners and MCIM's competitive strategies to win business from customers and potential customers.   All such information constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016.  See 18 U.S.C. § 1839(3).

132.    Further, Belisle assisted in the creation of, reviewed, and assisted in the modification of proprietary pricing and modeling data for MCIM.  MCIM's modeling data and outputs are highly sensitive commercial information that belong to the Company and would be of enormous value to a competitor in the industry.  MCIM's model consists of complicated algorithms that are based on information gathered over numerous years by MCIM and was created and customized using proprietary MCIM software and programming.  MCIM's model generates, among other things, pricing and loss reserving data that allows MCIM to provide innovative investment strategies to its investors and risk-management products to its clients.  Such information also constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016.  See 18 U.S.C. § 1839(3).

57

133.    The Companies took reasonable steps to protect the secrecy of these trade secrets by requiring all employees, as a condition of employment, to acknowledge and execute Company policies requiring employees to safeguard the Companies', and their customers', confidential and trade secret information.    MCIM maintained additional policies further instructing employees on the practices and requirements to safeguard such information.

134.    The Employment Agreement, as amended, states:

> This [Employment] Agreement also does not prohibit [Belisle] from receiving an award (if any) under applicable law for providing truthful information to a governmental agency or regulatory entity. U.S. federal law provides that: (a) an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (1) in confidence to a Federal, State, or local government official (either directly or indirectly) or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order. Nothing in this [Employment] Agreement prohibits, or creates liability for, any such protected conduct.

(Ex. A, Second Addendum at 2 (amending Section 11 of the Employment Agreement).)

135.    Belisle misappropriated the Companies' trade secrets when he breached his contractual duties and retained the trade secrets following the termination of his employment.

136.    Belisle has further threatened to misappropriate the Companies' trade secrets by his assertions of his intention to access and use such trade secrets that he retained for his own advantage.

137.    The Companies have repeatedly demanded return of the Companies' trade secrets.

138.    Belisle has refused to return the Companies' trade secrets.

139.     By reason of the foregoing conduct, the Companies have suffered damages to which they are entitled to recover.  In addition, the Companies continue to suffer immediate and irreparable harm for which it has no full, complete and adequate remedy at law.

**Fifth Counterclaim**
**Violation of New Hampshire Uniform Trade Secrets Act**

140.     The Companies restate and incorporate by reference all of the previous allegations herein as if fully set forth herein.

141.     As set forth above, Belisle had access to information regarding, among other things, all of the Companies' employees, clients, investors, business partners and MCIM's competitive strategies to win business from customers and potential customers.   All such information constitutes trade secrets within the meaning of the New Hampshire Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. §§ 350-B:1 to 350-B:9.   See N.H. Rev. Stat. Ann. § 350-B:1(IV).

142.     Further, Belisle assisted in the creation of, reviewed, and assisted in the modification of proprietary pricing and modeling data for MCIM.  MCIM's modeling data and outputs are highly sensitive commercial information that belong to the Company and would be of enormous value to a competitor in the industry.  MCIM's model consists of complicated algorithms that are based on information gathered over numerous years by MCIM and was created and customized using proprietary MCIM software and programming.  MCIM's model generates, among other things, pricing and loss reserving data that allows MCIM to provide innovative investment strategies to its investors and risk-management products to its clients.  Such information also constitutes trade secrets within the meaning of the New Hampshire Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. §§ 350-B:1 to 350-B:9.   See N.H. Rev. Stat. Ann. § 350-B:1(IV).

143.     The Companies took reasonable steps to protect the secrecy of these trade secrets by requiring all employees, as a condition of employment, to acknowledge and execute Company policies requiring employees to safeguard the Companies', and their customers', confidential and trade secret information.   MCIM maintained additional policies further instructing employees on the practices and requirements to safeguard such information.

144.     Belisle misappropriated the Companies' trade secrets when he breached his contractual duties and retained the trade secrets following the termination of his employment.

145.     Belisle has further threatened to misappropriate the Companies' trade secrets by his assertions of his intention to access and use such trade secrets that he retained for his own advantage.

146.     The Companies have repeatedly demanded return of the Companies' trade secrets.

147.     Belisle has refused to return the Companies' trade secrets.

148.     By reason of the foregoing conduct, the Companies have suffered damages to which they are entitled to recover.   In addition, the Companies continue to suffer immediate and irreparable harm for which it has no full, complete and adequate remedy at law.

**Jury Demand**

Defendants-counterclaim plaintiffs demand trial by jury on all counts so triable.

**Prayer for Relief**

WHEREFORE,   defendants-counterclaim   plaintiffs   Markel   CATCo   Investment Management Ltd. and Markel Corporation respectfully request that this Court award the following relief:

A.     Dismiss all claims by Plaintiff Anthony Belisle;

B.     Grant a permanent injunction enjoining Belisle from (1) misappropriating the Companies' trade secret information, (2) using or disclosing the Companies' Confidential Information in violation of the Employment Agreement and (3) taking any action inconsistent with his obligations under the Employment Agreement;

C.     Grant a permanent injunction for the immediate release and return of all property of the Companies whether in electronic or hard form;

D.     Enter judgment in favor of the Companies on all counts set forth above;

E.     Award damages to the Companies in the amount of the losses they have sustained as a result of the wrongful and unlawful conduct of Belisle;

F.     Award the Companies exemplary damages;

G.     Award the Companies treble damages due to Belisle's knowing and willful conduct;

H.     Award the Companies punitive damages under federal law due to Belisle's willful, wanton and malicious conduct;

I.     Award the Companies their attorneys' fees and costs incurred in this action; and

J.     Grant such further relief as may be just, equitable and appropriate.

Dated:  April 29, 2019
      Manchester, New Hampshire

Respectfully submitted,


/s/ Edward J. Sackman

James R. Carroll (*pro hac vice* forthcoming)
Christopher A. Lisy (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.lisy@skadden.com


David E. Schwartz (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
david.schwartz@skadden.com

Edward J. Sackman (N.H. Bar ID #19586)
Richard C. Gagliuso (N.H. Bar ID #874)
Christina A. Ferrari (N.H. Bar ID #19836)
BERNSTEIN, SHUR, SAWYER
   & NELSON, P. A.
Jefferson Mill Building
670 North Commercial Street, Suite 108
Manchester, New Hampshire 03101
(603) 623-8700
nsackman@bernsteinshur.com
rgagliuso@bernsteinshur.com
cferrari@bernsteinshur.com


Counsel for Defendants
Markel CATCo Investment Management Ltd
and Markel Corp